WILSHIRE WESTWOOD ASSOCIATES;
Platt Development Company,
Plaintiffs–Appellants,

v.

ATLANTIC RICHFIELD CORPORA-
TION; Peter J. Ruddock; John Craw-
ford; Thomas Crawford; and Does 1
through 20, Defendants–Appellees.

No. 88–5708.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1988.

Decided Aug. 7, 1989.

Rene P. Tatro, San Francisco, Cal., for plaintiffs-appellants.

Patrick W. Dennis, Los Angeles, Cal., for Atlantic Richfield.

T. Emmet Thornton, Los Angeles, Cal., for Peter Ruddock.

Gary R. Ricks, Santa Barbara, Cal., for John Crawford, defendants-appellees.

M. Alice Thurston, Washington, D.C., for amicus U.S.

Before REINHARDT and O'SCANNLAIN, Circuit Judges, and COYLE, District Judge.*

COYLE, District Judge:

Wilshire Westwood Associates and Platt Development Company appeal the district court's dismissal pursuant to F.R.Civ.P. 12(b)(6) of their complaint against Atlantic Richfield Corporation, Peter J. Ruddock, John Crawford and Thomas Crawford. The district court concluded that the petroleum exclusion set forth in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601(14), applies to leaded gasoline. We affirm.

---

* Honorable Robert E. Coyle, United States District Judge for the Eastern District of California, sitting by designation.

## A. *Background.*

On April 8, 1987 Wilshire Westwood Associates and Platt Development Company (hereinafter referred to as plaintiffs) filed a complaint against Atlantic Richfield Corporation, Peter J. Ruddock, John Crawford and Thomas Crawford (hereinafter referred to as defendants) alleging a claim for response costs from defendants pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)(2)(B).[1] The complaint alleges at paragraph 6 that "[t]he gasoline stored in leaking underground storage tanks ... contained additives with hazardous substances including, but not limited to, benzene, toluene, xylene, ethyl-benzene and lead [which] leaked from the underground storage tanks and contaminated soils...." Paragraphs 30 and 32 respectively allege that "[t]he substances identified in paragraph 6 ... are hazardous substances within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14)" and that "[t]here have been releases or threatened releases of hazardous substances, including, but not limited to, those identified in paragraph 6 ... into the environment ... within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).[2]

The district court initially denied motions made pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure to dismiss plaintiffs' claim under CERCLA, ruling in pertinent part:

**1.** 42 U.S.C. § 9607(a)(2)(B) provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

．　　．　　．　　．　　．

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of

．　　．　　．　　．　　．

(4) ... shall be liable for—
(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

**2.** 42 U.S.C. § 9601(14) defines the term "hazardous substance" as:

(14) The term 'hazardous substance' means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or sub-

(1) CERCLA's petroleum exclusion covers gasoline as well as its hazardous constituents: benzene, ethylbenzene, toluene and xylene, although said constituents are specifically listed as hazardous substances under CERCLA. This is because whether or not these constituents are fractions of petroleum, to interpret the petroleum exclusion otherwise would render the exclusion meaningless since it would result in no petroleum products coming under the petroleum exclusion.

(2) CERCLA's petroleum exclusion does not cover leaded gasoline because

(a) Lead is an additive to gasoline; it is not 'petroleum, including crude oil or any fraction thereof ...'

(b) Lead is specifically listed as a hazardous substance under CERCLA.

(c) There is no reason to treat lead differently when it is released as a part of gasoline from when it is released in any other form. *See United States v. Carolawn Co.*, 14 Envtl.L. Rep. 20696 (D.S.C. June 15, 1984) (lead is a hazardous substance when released in water-based paint).

The district court subsequently reconsidered this ruling upon motion because of a memorandum dated July 31, 1987 from the General Counsel of the Environmental Protection Agency to the Assistant Administrator for Solid Waste and Emergency Re-

stance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. *The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph,* and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). [emphasis added]

sponse. Based on this memorandum, the district court ruled on reconsideration that CERCLA's petroleum exclusion applies to leaded gasoline and dismissed plaintiffs' claim under CERCLA.[3]

Plaintiffs appeal. The issue presented in this appeal is whether the exclusion from the definition of "hazardous substances" in CERCLA for "petroleum, including crude oil and any fraction thereof not specifically listed as a hazardous substance" includes refined gasoline and all of its components and additives.

### B. *Request for Judicial Notice.*

Rule 201(b)(2), Federal Rules of Evidence, allows the court to take judicial notice of a fact not subject to reasonable dispute because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

It is undisputable that benzene, toluene, xylene, ethylbenzene and lead are hazardous substances, having been specifically listed or designated pursuant to several of the statutes set forth in Section 9601(14)(a)–(F).

We take judicial notice that benzene, toluene, xylene, ethylbenzene and lead also are all indigenous components of crude oil. We also take judicial notice of the meaning of the words "fraction" and "petroleum." Thus, "fraction" is defined in Webster's Third New International Dictionary Unabridged (1981) to mean "one of several portions (as of a distillate or precipitate) separable by fractionation and consisting either of mixtures or pure chemical compounds." "Petroleum" is defined in relevant part as:

> [A]n oily flammable bituminous liquid ... that is essentially a compound mixture of hydrocarbons of different types with small amounts of other substances (as oxygen compounds, sulfur compounds, nitrogen compounds, resinous and asphaltic components, and metallic compounds) ... and that is subjected to

various refining processes (a fractional distillation, cracking, catalytic reforming, hydroforming, alkylation, polymerization) for producing useful products (as gasoline, naphtha, kerosene, fuel oils, lubricants, waxes, asphalt, coke, and chemicals)
> . . . .

### C. *Standard of Review.*

■ A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is a ruling on a question of law and as such is reviewed *de novo*. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988). Interpretation of a statute is a question of law also subject to *de novo* review. *Trustees of Amalgamated Insurance Fund v. Geltman Industries, Inc.*, 784 F.2d 926, 928 (9th Cir.), *cert. denied*, 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986); *United States v. Horowitz*, 756 F.2d 1400, 1403 (9th Cir.), *cert. denied*, 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 60 (1985).

### D. *Statutory Interpretation.*

■ As noted, the definition of hazardous substance in Section 9601(14) contains an exclusion therefrom commonly referred to as the "petroleum exclusion." The petroleum exclusion provides that the term hazardous substance "does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated a hazardous substance under subparagraphs (A) through (F) of this paragraph...." Neither the term "petroleum" nor "fraction" are defined in CERCLA.

#### 1. Plain Meaning.

The plain language of a statute is the starting point for its interpretation. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

---

**3.** The district court simultaneously dismissed plaintiffs' pendent claims for lack of subject matter jurisdiction, thereby resulting in dismissal of the action. The dismissal of the pendent claims is not at issue in this appeal.

meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). However, "[d]eparture from a literal reading of statutory language may ... be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose." *Malat v. Riddell*, 383 U.S. 569, 571–72, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966). "If the intent of Congress is clear, that is the end of the matter; for the court ... must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Because "CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment [, courts] are ... obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purposes ... 'in the absence of a specific congressional intent otherwise.'" *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986) (citations omitted). However, "[t]his court must look beyond the express language of a statute where a literal interpretation 'would thwart the purpose of the over-all statutory scheme or lead to an absurd result.'" *Brooks v. Donovan*, 699 F.2d 1010, 1011 (9th Cir. 1983) (citations omitted). And "[s]tatutes should not be construed to make surplusage of any provision." *Pettis ex rel. United States v. Morrison–Knudsen Co.*, 577 F.2d 668, 673 (9th Cir.1978).

Plaintiffs contend that the petroleum exclusion's plain and unambiguous terms compel the construction that it does not apply to petroleum, crude oil or any fraction thereof containing any of the components which have been designated as haz-ardous pursuant to any one of the acts listed in Section 9601(14)(A)–(F).

In our view, however, the application of the standards governing statutory construction to the words of the petroleum exclusion requires us to exclude gasoline, even leaded gasoline, from the term "hazardous substance" for purposes of CERCLA. Any other construction ignores the plain language of the statute and renders the petroleum exclusion a nullity.

■ Plaintiffs rely upon the canon of statutory construction known as the "doctrine of the last antecedent." The doctrine of the last antecedent states that qualifying words, phrases and clauses must be applied to the words or phrases immediately preceding them and are not to be construed as extending to and including others more remote. *First Charter Financial Corp. v. United States*, 669 F.2d 1342, 1350 (9th Cir.1982); *United States v. Metate Asbestos Corp.*, 584 F.Supp. 1143, 1147 (D.Ariz.1984). Plaintiffs contend that in the application of this doctrine "the limiting words 'which is not otherwise specifically listed' plainly modify the preceding *words* of Section 9601(14): '[t]he term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof' and creates an exception." [emphasis added]

We cannot agree with plaintiffs' application of the doctrine of the last antecedent. As we apply it, the doctrine compels the construction that "hazardous substance" does not include any fraction of crude oil which has been listed or designated as a hazardous substance under Section 9601(14)(A)–(F). The word immediately preceding the qualifying phrase is "fraction."[4] Plaintiffs' proposed application ex-

---

**4.** In line with this construction, defendants contend that gasoline is the only fraction of crude oil alleged in the complaint to have been released onto the property. The other substances, including benzene, are all alleged to have been additives to the gasoline. Therefore, defendants argue: "The plain language of the statute is clear that *only* when the particular *fraction* of crude oil is separately listed will it be considered a hazardous substance. Gasoline does not appear on any of the lists identified in subparagraphs (A) through (F) of section 9601(14) and therefore is not a hazardous substance." Plaintiffs contend in their reply brief that benzene itself is a fraction of petroleum. Benzene is defined as "a colorless volatile flammable toxic liquid hydrocarbon ... that is us[ually] obtained commercially from the carbonization of coal ... or from certain petroleum fractions by catalytic dehydrogenation, and that is used chiefly in organic synthesis ..., as a solvent, and as a motor fuel (as for blending with gasoline)." Webster's Third New Interna-

tends to more remote words and is ungrammatical. Plaintiffs' application of the doctrine of last antecedent necessarily requires a plural verb in the qualifying phrase while the actual grammar sets forth a singular verb.

In further support of their construction of the plain meaning of the petroleum exclusion, plaintiffs point out that lead, benzene, ethyl-benzene and toluene are hazardous substances covered by CERCLA if released as part of chemical wastes, *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 182–83 (W.D.Mo.1985), that ethyl-benzene and xylene are hazardous substances when constituents of coal tar, *United States v. Union Gas Co.,* 586 F.Supp. 1522, 1523 (E.D.Pa.1984), and that lead is a hazardous substance when it is a component of water-based paint, *United States v. Carolawn Co.,* 21 E.R.C. 2124, 2125–26 (D.S.C.1984). Plaintiffs argue therefrom: "[That] those same specifically listed substances would not be considered hazardous if released as a result of leaking underground gasoline storage tanks ... cannot be what Congress intended. Such an interpretation would render meaningless the exception to the petroleum exclusion."

However, there are no exclusions in CERCLA similar to the petroleum exclusion for chemical wastes, coal tar and water-based paints. Consequently, plaintiffs' reliance on these cases to support their construction is misplaced.

Moreover, because all of the substances complained of herein and designated as hazardous pursuant to other statutes are indigenous to crude oil, *see* discussion *supra,* the construction advocated by plaintiffs would have the effect of rendering the petroleum exclusion a nullity because all crude oil, petroleum and petroleum fractions, unrefined or refined, would fall outside its ambit. While plaintiffs contend that their construction of the plain meaning of the petroleum exclusion would still leave some substances within its scope, *e.g.,* unrefined oil and other petroleum products that do not contain constituents added or created during the refining process, the distinction between those substances which are added to a petroleum product and those substances which may be indigenous to petroleum is nonsensical because all of the substances plaintiffs allege were additives to the gasoline also exist as indigenous components of crude oil.[5]

2. Legislative History.

Although our conclusion regarding the plain meaning of the scope of the petroleum exclusion makes unnecessary resort to the next step in statutory construction, legislative history, *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), we are persuaded that the legislative history supports our plain meaning construction.

There is virtually no legislative history contemporaneous with the enactment of CERCLA directly relevant to the scope of the petroleum exclusion. This dearth is probably because CERCLA was enacted as a compromise among three competing bills, H.R. 7020, H.R. 85, and S. 1480, after very limited debate under a suspension of the

tional Dictionary Unabridged (1981). Therefore, plaintiffs argue: "Whether the benzene is pure or blended with gasoline is not the issue.... If the exception to the petroleum exclusion is to be interpreted by its plain meaning, it must apply to any listed fraction." However, as judicially noted, benzene also is an indigenous component of crude oil.

5. The United States argues that if the term petroleum in the exclusion does not include any standard industry additives to gasoline, almost every petroleum spill or leak would be redressible under CERCLA, a circumstance which would vastly broaden the potential exposure of the limited CERCLA funds. However, if the petroleum exclusion is interpreted to remove

from CERCLA coverage not only "unadulterated petroleum fractions but also those which have been contaminated during use," the EPA's cleanup authority would be severely hampered and the agency would be effectively prevented from addressing many contaminated sites. Thus, the United States urges the court to interpret the petroleum exclusion as limited to releases of crude oil and refined petroleum and petroleum fractions. In our opinion, the statutory construction and the concern expressed by the United States relative to "unadulterated petroleum fractions [and] those which have been contaminated during use" is not necessary to the resolution of this appeal.

rules. *See Dedham Water Co., supra*, 805 F.2d at 1080; *United States v. Mottolo*, 605 F.Supp. 898, 902–05 (D.N.H.1985); Grad, "A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980," 8 *Colum.J.Envtl.L.* 1–2 (1982).[6] Of these three bills, only H.R. 85 addressed oil spills. H.R. 85 was reported to the Senate but no further action was taken on it. Grad, *supra* at 4.

In arguing that the legislative history of CERCLA supports their position that gasoline and its additives and constituents when refined are not included within the petroleum exclusion, plaintiffs quote from the Report of the Senate Committee on Environment and Public Works accompanying S. 1480 that "[t]he reported bill does not cover spills or other releases strictly of oil." I Superfund: A Legislative History, Environmental Law Institute, Washington, D.C. (1982), 12–13, quoting from S.Rep. No. 96-848, 96th Cong., 2d Sess., July 11, 1980, 1980 U.S.Code Cong. & Admin.News 6119. This argument is disingenuous. The plain meaning and common use of "oil" includes not just crude oil but its various refined fractions. Moreover, one of the definitions for "oil" is "petroleum." *See* Webster's Third New International Dictionary Unabridged (1981).

That Congress had before it the statutory definition of hazardous substances and a list of the substances which had been designated as hazardous under other federal laws when CERCLA was enacted is contended by plaintiff's to mean that the phrase "not otherwise specifically listed or designated as a hazardous substance" in the petroleum exclusion "was not considered blindly without a referent" and that "the statute including the petroleum exclusion was passed with the substances about which plaintiffs complain specifically listed and, therefore, excepted from the definition." In addition, plaintiffs contend: "A review of the legislative history shows that each time the term 'hazardous substance' was defined, Congress used the same

words. The definition, including the final sentence—the petroleum exclusion—and its exception—remained unchanged."

In our opinion, these arguments do not constitute an indication from the legislative history that Congress intended that the petroleum exclusion not encompass petroleum which contains any designated hazardous substances.

The contemporaneous legislative history concerning the scope of the petroleum exclusion being so sparse, we next examine congressional action when Congress was presented with opportunities to amend CERCLA.

Specifically, we refer to H.R. 1881, 99th Cong., 1st Sess. (1985). Defendants, citing [15 Current Developments] Env't Rep. (BNA) 2191 (April 12, 1985), assert that Section 1(b) of H.R. 1881, introduced by Congressman Downey but never progressing beyond its introduction, would have amended CERCLA as follows:

The provisions of [CERCLA] ... shall apply to petroleum, including crude oil or any fraction or component or derivative thereof, in the same manner and to the same extent as such provisions apply to any hazardous substance referred to in paragraph (14) [42 U.S.C. Section 9601(14)], but only if such petroleum (or fraction, component or derivative thereof) is otherwise specifically listed or designated as a hazardous substance under [the subparagraphs of 42 U.S.C. Section 9601(14)]....

In addition, reference is made to the Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98–616, 98 Stat. 3221. Section 601(a) of the Amendments added Subtitle I, §§ 9001–9010, to the Solid Waste Disposal Act of 1965 ("SWDA" or "RCRA") pertaining to the regulation of underground storage tanks. *See* 42 U.S.C. §§ 6991–6991i *as amended by* the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100

6. H.R. 7020, 96th Cong., 2d Sess. (1980) ("Hazardous Waste Containment Act"); H.R. 85, 96th Cong., 1st Sess. (1979) ("Oil Pollution Liability and Compensation Act"); S. 1480, 96th Cong., 1st Sess. (1979) ("Environmental Emergency Response Act").

Stat. 1613.[7] An underground storage tank is defined in Section 9001 as "any one or combination of tanks (including underground pipes connected thereto) which is used to contain an accumulation of regulated substances ..." with certain exceptions not pertinent here. Section 9001(2) defines "regulated substance" as:

(A) Any substance defined in Section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (but not including any substance regulated as a hazardous waste under Subtitle C), and

(B) Petroleum, including crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch absolute).

Senator Durenberger introduced the 1984 Amendment, stating as follows:

Underground storage tanks are seldom regulated. At present, Federal regulation of storage tanks covers only aboveground tanks containing chemical wastes. And, if a tank is leaking, the Federal Government cannot under Superfund authority respond or clean up a spill if it involves petroleum products.

.    .    .    .    .

The tank storage of one of the most common underground contaminants—gasoline—is unregulated because it is not a waste product (and thus not under the authority of the Resource Conservation and Recovery Act), and spills of the fuel cannot be cleaned up under the Superfund law because it is a petroleum product.

130 Cong.Rec. S2028, S2080 (daily ed. Feb. 29, 1984). Finally, in 1986, Congress, in Section 205 of the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. 99–499, 100 Stat. 1613, further amended Subtitle I of the Solid Waste Disposal Act by adding Section 9003(h), 42 U.S.C. § 6991b(h), to establish a separate response program for petroleum leaking from underground storage tanks, the re-

sponse program being funded by a Leaking Underground Storage Tank Trust Fund financed by taxes on motor fuels. The Conference Report accompanying SARA, H.R. Rep. No. 962, 99th Cong., 2d Sess. 183, 263 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3276, 3356 adopted the House provision for the definition of petroleum for purposes of Section 9003(c), the Senate Amendment containing no provision:

The response program established by this subsection is available only for tanks containing petroleum substances. The House amendment contains an explicit definition of the term petroleum. The definition is a restatement of the meaning of the term as established by current law in Section 9001(2) of the Solid Waste Disposal Act. The new definition does not add or remove from regulation any substance or underground tank subject to current law.

Representative Stangeland stated in the House debate on SARA:

Another bold initiative included in the bill is an expanded program for cleanup of leaking underground storage tanks. The 1984 amendments to the Solid Waste Disposal Act authorized a regulatory program to address the problem of leaking underground storage tanks, including petroleum tanks which are not covered by Superfund. Under the amendments included in the conference report, the existing regulatory program is expanded upon to authorize EPA to require the owner of underground petroleum tank to undertake cleanup if the tank should fail or allow EPA to undertake the work if the tank owner can't or won't clean up the leak.

132 Cong.Rec. H9572 (daily ed. Oct. 8, 1986). SARA left unchanged the petroleum exclusion set forth in 42 U.S.C. § 9601(14). SARA did amend CERCLA by adding to CERCLA in Section 101(33), 42 U.S.C. § 9601(33), a definition of the term "pollutant or contaminant." This defini-

---

7. The Solid Waste Disposal Act is also known as the Resource Conservation and Recovery Act of 1976 or "RCRA." According to *Grad, supra* at p.

2 n. 9, RCRA came into being as an amendment to the Solid Waste Disposal Act of 1965.

tion contains a petroleum exclusion identical to the exclusion in Section 9601(14). During debate on SARA in the Senate, Senator Simpson stated in pertinent part:

> This bill will not diminish the scope of the present petroleum exclusion. That provision, found in section 101(14) of the Act excludes from the definition of 'hazardous substances' all types of petroleum, including crude oil, crude oil tank bottoms, refined fractions of crude oil, and tank bottoms of such which are not specifically listed or designated as a hazardous substance under the other subparagraphs of that provision.

132 Cong.Rec. S14932 (daily ed. Oct. 3, 1986).

The rejection of H.R. 1881 in 1985 and the failure to amend the petroleum exclusion when CERCLA was amended by SARA in 1986 even though the EPA had already clarified its interpretation of the exclusion to cover gasoline and other refined products and their components and additives, *see* discussion *infra,* are asserted by defendants to constitute persuasive evidence that their interpretation of the petroleum exclusion is the one intended by Congress in 1980.

Although defendants' characterization of these two legislative events as "persuasive evidence" is too strong under the circumstances, these subsequent events are entitled to some weight:

> Although postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX....'
>
> ... Where 'an agency's statutory construction has been "fully brought to the attention of the public and the Congress," and the latter has not sought to alter the interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'

*North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982) (citations omitted). *See also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974). Because, however, the United States concedes that it is not clear that Congress was specifically aware of the EPA's prior interpretations of the petroleum exclusion in 1986, the failure of Congress to object to the EPA's interpretation is entitled to only modest weight. *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 167 and n. 33 (D.C.Cir.1982). Nonetheless, these postenactment developments lend credence to our plain meaning construction.

In any event, the more compelling indications of Congress's intent in 1980 concerning the scope of the petroleum exclusion are the amendments to the SWDA in 1984 and the amendments in 1986 to the SWDA and CERCLA enacted by SARA. While "it is well settled that ' "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one[,]" ' " *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983), the very specificity of these amendments to cover leaking gasoline, when conjoined with the unchanged wording of the petroleum exclusion, cannot be disregarded in fathoming legislative intent in 1980.

### 3. Agency Interpretation.

After looking to the legislative history, courts also look to the interpretation given to a statute by its administering agency as an aid in interpreting Congress's intent. *Brock v. Writers Guild of America, West, Inc.,* 762 F.2d 1349, 1353 (9th Cir.1985). Although unnecessary to our opinion, the EPA's interpretation of the scope of the petroleum exclusion is entirely consistent with its plain meaning and legislative history and constitutes highly persuasive evidence that our interpretation is correct.[8]

---

**8.** The relevant documents include three memoranda issued to subordinates by the General Counsel of the EPA and respectively dated December 2, 1982, August 12, 1983, and July 31, 1987. Also relevant are EPA pronouncements at 46 *Fed.Reg.* 22145 (April 15, 1981), at 50 *Fed.Reg.* 13460 (April 4, 1985), and at 51 *Fed. Reg.* 8106 (March 10, 1986).

As stated in *Chevron, U.S.A., supra,* 467 U.S. at 843–845, 104 S.Ct. at 2781–2783:

'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' ... If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations....

'... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' *United States v. Shimer,* 367 U.S. 374, 382, 383 [81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908] (1961). " 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of mak-ing the parts work efficiently and smoothly while they are yet untried and new." ' " *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), *quoting Power Reactor Co. v. International Union of Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961). As further explained in *Process Gas Consumers Group v. United States,* 694 F.2d 778, 791 (D.C.Cir.1982) (en banc), *cert. denied sub nom. Louisiana v. Federal Energy Regulatory Comm'n,* 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983) (footnotes omitted):

The extent to which courts should defer to agency interpretations of law is ultimately 'a function of Congress' intent on the subject as revealed in the particular statutory scheme at issue.' Thus, when Congress delegates full responsibility to an agency to implement a statute, but provides little guidance on how the governing statute should be interpreted, common sense suggests that Congress would wish courts to consider agency views on questions of law that are 'closely related ... to the everyday administration of the statute and to the agency's administrative or substantive expertise.'

Courts also consider the thoroughness of the agency's consideration, the validity of its reasoning, and the consistency of its position over time. *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

The United States argues that by implication the EPA is empowered to render conclusive decisions on what should or should not be considered a hazardous substance under CERCLA. In support thereof the United States notes that it is clear that Congress intended the EPA to have substantial discretion in administering CERCLA generally and refers the court to 42 U.S.C. § 9602(a):

(a) The Administrator shall promulgate and revise as may be appropriate, regulations designating as hazardous substances, in addition to those referred to in section 9601(14) of this title, such ele-

ments, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment, and shall promulgate regulations establishing that quantity of any hazardous substance the release of which shall be reported pursuant to section 9603 of this title. The Administrator may determine that one single quantity shall be the reportable quantity for any hazardous substance, regardless of the medium into which the hazardous substance is released.

Plaintiffs argue that the court should not accord this deference to the memoranda issued by the EPA concerning the scope of the petroleum exclusion. Plaintiffs cite *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) and *Independent Bankers Ass'n v. Smith*, 534 F.2d 921 (D.C.Cir.), *cert. denied sub nom. Bloom v. Independent Bankers Ass'n*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976) as authority that the EPA's memoranda are not binding on the court. Neither of these decisions, however, provide support for the contention that the court may disregard the EPA memoranda because of either the purpose underlying their issuance or the informality of their issuance.

Noting that a party's right to advance "a private cause of action for damages under CERCLA is not dependent upon a previous governmentally authorized cleanup program, *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 891–92 (9th Cir.1986), plaintiffs further argue that no deference is due these memoranda in an action between private parties because the memoranda are issued informally to guide and assist the EPA in setting priorities for the implementation of CERCLA and the allocation of its resources.

However, the memoranda, while expressing concerns about allocation of resources, are not couched solely in those terms. Moreover, while a decision by the EPA to authorize under CERCLA a program for the cleanup of gasoline spills is not a prerequisite to this action, the EPA's opinion whether such spills are encompassed within CERCLA's statutory provisions is extremely relevant. Plaintiffs' apparent suggestion that the petroleum exclusion be interpreted differently by the court and the EPA depending upon whether the action is private or public does not make sense in the absence of clearly expressed language in the statute or legislative history. *See Skidmore, supra,* 323 U.S. at 140, 65 S.Ct. at 164 ("Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only when justified by very good reasons.")

We conclude that the EPA's interpretation of the scope of the petroleum exclusion should be accorded considerable deference, especially because of the virtual absence of contemporaneous legislative history. While the EPA's opinions are not exactly contemporaneous with the enactment of the petroleum exclusion, its consideration has been very thorough and consistent over time.

### E. *Conclusion.*

We rule that the petroleum exclusion in CERCLA does apply to unrefined and refined gasoline even though certain of its indigenous components and certain additives during the refining process have themselves been designated as hazardous substances within the meaning of CERCLA.

AFFIRMED.

REINHARDT, Circuit Judge, specially concurring:

I concur in the court's opinion. I agree with the substance of the court's treatment of CERCLA'S legislative history and the interpretation accorded that statute by the EPA, and write separately only to emphasize that we need not go beyond the language of the statute itself in order to reach our result. In my view, the language of CERCLA'S "petroleum exclusion," contained in 42 U.S.C. § 9601(14), plainly applies to gasoline, even when, as here, that gasoline contains lead additives. The court

correctly examines the "plain language" of the statute, *ante* at 803–805, and applies the elementary rule that we give the words of a statute their "ordinary, contemporary, common meaning," unless doing so produces an absurd result, or one clearly contrary to the expressed intention of the statute's drafters. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *see also Pierce v. Underwood,* — U.S. ——, 108 S.Ct. 2541, 2547, 101 L.Ed.2d 490 (1988) (courts "turn first to the language and structure" of the relevant statute). In my view, the language of § 9601(14)'s petroleum exclusion flatly applies to gasoline, even if that gasoline may also contain a "hazardous substance" within the meaning of CERCLA (in this case, lead). To hold otherwise, as Wilshire Westwood seeks to have us do, would require us to construe the words Congress chose in something other than their ordinary meaning. Inasmuch as Wilshire Westwood has failed to offer any persuasive justification for doing so—either in the legislative history of the section or in the general policies served by CERCLA— the court rightly refuses to depart from the ordinary construction of the statute's words.

O'SCANNLAIN, Circuit Judge, concurs fully in the opinion authored for the court by Judge COYLE and also concurs in the special concurrence of Judge REINHARDT.