Aaron **COOLEY**, Plaintiff–Appellee,

v.

**CARMIKE CINEMAS, INC.**, Defendant–Appellant.

No. 93–5110.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 6, 1993.

Decided June 14, 1994.

Anita B. Hardeman (briefed), Harry F. Burnette (argued), Michael S. Pineda, Brown, Dobson, Burnette & Kesler, Chattanooga, TN, for plaintiff-appellee.

Sam C. Elliott (briefed), Gearhiser, Peters & Horton, Chattanooga, TN, Daniel S. Reinhardt (briefed), William N. Withrow (argued and briefed), Jana E. Hubbard (briefed), Troutman Sanders, Atlanta, GA, for defendant-appellant.

Before: BOGGS and NORRIS, Circuit Judges; and BELL, District Judge.*

BOGGS, Circuit Judge.

This appeal stems from an action claiming wrongful termination, brought under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634, and the Tennessee Human Rights Act (THRA), Tenn. Code Ann. §§ 4–21–101 to –806 (1991 & Supp.1993). A jury returned a verdict for the terminated employee of about $500,000, and the employer appeals. For the reasons set forth below, we affirm.

**I**

Aaron Cooley had worked for the same theater chain since 1953, working his way up from "popcorn man" to Chattanooga city manager, when the chain came under new management in 1982. The new owner, Carmike Cinemas ("Carmike"), was headed by Michael Patrick, the president, chief executive officer, and principal stockholder.[1] Coo-

---

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

1. It appears that Carmike Cinemas bought the theaters from Fuqua Industries in 1982. The theaters were apparently a subsidiary of Fuqua Industries since the early 1970s. Prior to that

ley continued in his job, supervising eighty-five employees, and handling everything from auditing ticket sales to advertising to maintenance. In his trial court testimony, Cooley spoke proudly of his 80–hour work week and of his devotion to his job. He testified that he had even changed his planned wedding date in 1956 to accommodate a prior board chairman's request that he relocate from Florida to Georgia by a certain date. As Carmike's Chattanooga city manager, Cooley answered to Lloyd Reddish, the district manager. Reddish's direct superior in 1988 was Buren ("Tiny") Eidson, the division manager.

In December 1988, in the face of competition from other movie theaters in the Chattanooga area, Eidson ordered Cooley to run a full daily schedule of five shows, consisting of three matinees and two evening screenings, through the Christmas season. Cooley passed along the information to Reddish, his district manager. Eidson wanted the first matinee to be shown on Christmas Day, too, but Reddish, who had decided in previous years not to screen the early show on Christmas, indicated to Cooley that, despite the new directive, the Chattanooga district would continue to drop the early Christmas matinee, just as it had done in the past. Based on his immediate superior's decision, Cooley placed advertising in the local newspaper that omitted the early matinee from the Christmas Day schedule.

On Wednesday, December 21, Reddish reversed himself and told Cooley that Carmike management was insistent that the fifth showing be screened on Christmas Day; therefore, the local theater would indeed have to run the full schedule. Cooley tried to reach his account representative at the newspaper in which he advertised to insert the extra showing time. He phoned a number of times. Unfortunately, the receptionist who answered his calls insisted that no one but Cooley's direct sales representative had the authority to change an advertisement that he had already placed, and that representative could not be reached. When Cooley explained the logistical problem to his district manager, Reddish decided to leave the advertisement as it was and to drop the first show, after all.

The early matinee was not screened on Christmas Day. Eidson fired Cooley.

At trial, Eidson testified that he investigated the entire incident, calling the newspaper and also talking to Cooley. As a result, he testified that he decided on January 2 to fire Cooley, and he hired the new city manager only after reaching that determination. However, Reddish testified at deposition [2] that he had already been told on December 31 to fire Cooley, even though he responded that management was "firing the wrong person. I'm the person that you should be firing because I made the decision not to run the first show." Moreover, Melvin Cates testified that he was hired on December 31 to replace Cooley and that he arrived in Chattanooga on January 1, all before Cooley's January 2 dismissal.

Carmike maintains that it fired Cooley primarily for three manifestations of "insubordination": (1) he failed to change the newspaper advertisement; (2) he did not screen the first Christmas show; and (3) he ran ads on AM radio despite clear instructions that he was to purchase FM radio time only. However, the jury believed Cooley's version of events, supported by testimony that he tried to change the display ad and that he merely followed Reddish's directions. Moreover, Cooley showed that he had complied with corporate policy and had purchased FM time

time, they were a chain called "Martin Theaters." Cooley had been with the chain since the 1950s, as of the "Martin Theater" period. Despite the changes in name and corporate ownership, it seems that the Patricks have dominated the chain throughout the period. In the 1950s, Michael Patrick's father was the vice-president and general manager of Martin Theaters. Cooley remembered him as being the board chairman. Later, in 1988, before firing Cooley, Michael Patrick discussed the matter with his father, whom he described as being the chairman of the board and the chief executive officer at the time.

2. Although this testimony would have been more persuasive and dramatic had it come from Mr. Reddish at trial, it was explained at oral argument that he did not testify at trial because he was recuperating from a heart attack. Reddish's pre-trial deposition was introduced on the trial's first day.

exclusively; the FM station, for its own promotional reasons, "threw in" additional advertising on its AM station as part of a "package" that it offered all its advertisers.

The jury believed Cooley's contention that Carmike's Christmas story was humbug and that he was really fired as part of a corporate effort to clear out older employees. In the course of proving his contention, Cooley testified that Patrick despised older people. For example, he related that Reddish, who had previously held the higher corporate position of vice president and general manager in Columbus, Georgia, had once told him of a strange conversation with Patrick that had taken place on a Thanksgiving Day. As Cooley remembered it, Reddish said to him:

"[On] Thanksgiving [Patrick] made the statement, 'I got to go over to my mom's and dad's and have lunch today with them. . . . I don't want to go.'"

[Reddish] said, "Well, Mike, why? This is Thanksgiving."

And [Patrick's] words were, "'Well, my grandmother is over there, and I just don't want to be—I don't like to be around old people.'"

Cooley further testified that, back in 1968, when Patrick was eighteen-years-old, he had come out of the movie theater after seeing "Wild in the Streets"[3] and said to Cooley, "Yeah, I believe that. Everybody over 30 years old needs to be put in a pen. Yeah, if they don't want to be put in a pen, they should be confined to a concentration camp."

The jury, persuaded that Cooley was fired because of his age, found that Patrick and Carmike had violated the ADEA and awarded Cooley $116,363 in back pay, $249,741 in front pay, $85,000 for mental distress, plus interest and costs. The district judge later assessed Carmike an additional $65,837 in attorney's fees and costs. Carmike appeals from certain evidentiary rulings made by the district judge; from a portion of the jury instructions; and from the jury award, which it characterizes as "excessive."

## II

In evaluating age-discrimination claims, this court applies the four-step "McDonnell Douglas Test." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990). Under this test, to establish a *prima facie* case of age discrimination, the plaintiff bears the initial burden to prove by a preponderance of the evidence that: (1) he was at least 40 years of age at the time of the alleged discrimination ("a member of a protected class"); (2) he was subjected to adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a younger person. *Lilley v. BTM Corp.,* 958 F.2d 746, 752 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992).

Once the plaintiff proves his *prima facie* case, the burden shifts to the employer to "articulate some legitimate non-discriminatory reason for the employee's discharge." The employer need not persuade the court that it was actually motivated by the proffered reasons. *West v. Wright Constr. Co.,* 756 F.2d 31, 33 (6th Cir.1985). It is sufficient if the employer raises a genuine issue of fact as to whether or not it discriminated. The explanation must be legally sufficient to justify a judgment for the defendant. *Ibid.* "Where two or more alternative and independent legitimate, nondiscriminatory reasons are articulated by the defendant employer, the falsity or incorrectness of one may not impeach the credibility of the remaining articulated reason(s)." *Sims v. Cleland,* 813 F.2d 790, 793 (6th Cir.1987). If the employer meets the burden of articulation, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the employer was not its true reason but merely a pretext for discrimination. *Ang,* 932 F.2d at 548.

A plaintiff can prove pretext "by showing that the Company's reasons have no

---

**3.** The movie is a "[d]ark satire about [a] millionaire singing idol/drug pusher who is elected President after [the] voting age is lowered to 14."

*See* Leonard Maltin, *Leonard Maltin's TV Movies and Video Guide* 1365 (1992).

basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge, or, if they were factors, by showing that they were jointly insufficient to motivate the discharge." *Ridenour v. Lawson Co.,* 791 F.2d 52, 56 (6th Cir.1986) (quoting *La Montagne v. American Convenience Prods., Inc.,* 750 F.2d 1405, 1414–15 (7th Cir.1984)). "The trier of fact may rely on the evidence introduced to establish the prima facie case and any inferences properly drawn therefrom." *Ibid.*

In this case, Carmike claims that it more than met its burden of articulation, presenting at least three legitimate non-discriminatory reasons for Cooley's discharge. Although the jury found those reasons to be pretextual, Carmike contends that the weight of the admissible evidence did not support the jury's finding that the company had discriminated. Rather, Carmike maintains, the court abused its discretion under Federal Rule of Evidence 403 and committed reversible error by allowing the jury to hear highly inflammatory testimony about Patrick's concentration-camp remark during his teens and about his later comments concerning spending Thanksgiving with his grandmother ("the grandmother comment"). The defendants argue that those statements prejudiced the jury, resulting in an irrational verdict. In addition, Carmike appeals from the court's decision to admit statements that it believes were inadmissible under the hearsay rules. Fed.R.Evid. 801 *et seq.*

After the jury verdict, Carmike moved the district court for a new trial. The district judge, reflecting on his admission of the challenged testimony, wrote in his memorandum denying the motion:

> If the Court had it to do over again, it would have ruled out, on Fed.R.Evid. 403 grounds, the "concentration camp" statement allegedly made by Mr. Patrick when he was a young man. However, in view of evidence of other statements made by Mr. Patrick ... this ruling had no bearing on the outcome of the case and, if error, it is harmless error.

Carmike responds that the quotation was too inflammatory to be "harmless."

■ We review the district court's evidentiary decisions for abuse of discretion, and we will reverse only when we find that such abuse of discretion has caused more than harmless error. *United States v. Markarian,* 967 F.2d 1098, 1103 (6th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1344, 122 L.Ed.2d 726 (1993); Fed.R.Civ.P. 61.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....

Fed.R.Evid. 403. "Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission." *Ibid.* advisory committee's note. In age discrimination cases, this court has examined statements allegedly showing employer bias by considering whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination. However, this court has not previously expressly spelled out these considerations as a formal standard. We do so today.

■ Recently, in *Phelps v. Yale Security, Inc.,* 986 F.2d 1020 (6th Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993), the plaintiff employee produced evidence that, eight months before her layoff, her employer had told her that she had been transferred from a more responsible position because she was too old to continue at that prior secretarial position. A month later that same employer told her that her fifty-fifth birthday was a cause for concern. Nevertheless, this court upheld a district judge's judgment for the defendant employer, notwithstanding the jury verdict for plaintiff, because the plaintiff's evidence consisted only of such isolated and ambiguous comments by the employer. We held them to be "too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination" because the comments had been made nearly a year before the layoff, too

long before the layoff to have influenced the termination decision. In addition, we regarded the comment about the birthday to be too ambiguous to establish any conclusive inferences. *Id.* at 1025–26.

In *Mitroff v. Xomox Corp.*, 797 F.2d 271 (6th Cir.1986), the plaintiff and another witness testified that one of the employer's assistant personnel managers had told them that the company practiced age discrimination. This court held that the district court had abused its discretion by admitting such hearsay testimony. Even if the assistant personnel manager himself had been proffered as a witness to testify first-hand, this court held that he could not have qualified as an expert eligible to present his opinions to the jury under Rules 701–705. He was merely an assistant personnel manager who dealt with hourly employees, not someone with the expertise to evaluate whether the company's salaried personnel faced age discrimination. Because the fact pattern in *Mitroff* was very close, and the hearsay testimony was the strongest evidence presented by the plaintiff, this court remanded for a new trial. *Id.* at 277.

In *Gagne v. Northwestern National Insurance Co.*, 881 F.2d 309 (6th Cir.1989), this court affirmed summary judgment for the defendant employer in a case where the plaintiff had based her claim of age discrimination on one isolated comment by her boss that he "needed younger blood" and on affidavits from three co-workers, all of whom were based in different departments and work areas from where the plaintiff worked, that she performed her assignments satisfactorily. *Id.* at 315–16.

On the other hand, in *Rose v. National Cash Register Corp.*, 703 F.2d 225 (6th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983), *rev'd in part on other grounds sub nom. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), this court held that a plaintiff had established a prima facie case of age discrimination through his testimony and that of two other former employees of the company that NCR sought to establish a new "younger image" for the company. *Id.* at 226. This court was especially persuaded by

plaintiff's testimony that the vice-president of the firm's midwest region, where plaintiff worked, told him: "Men your age, there isn't going to be any future in the new NCR." *Id.* at 226–27.

It is in the light of this court's previous decisions in cases like *Phelps, Mitroff, Gagne,* and *Rose* that we must consider Carmike's appeal in this case from the district judge's decisions to admit the "grandmother comment" and the "concentration-camp remark" into evidence.

Certainly, such comments are highly evocative. In this case, the jury was already being presented with a Scrooge-like fact pattern, in which an employer had fired an 80–hour–per–week, 35–year employee for not screening the first matinee on Christmas Day. Therefore, the second-hand—and even third-hand—testimony that this employer had said two decades earlier, in his teen years, that he wanted to put older people in "a concentration camp"—and the testimony that recounted the later opprobrious "grandmother comment"—could have jolted the jury.

On the other hand, Patrick is the ultimate decision maker at Carmike, and Cooley had the burden to prove by the preponderance of the evidence that Patrick's resentful comments against the aged were not vague, ambiguous, or isolated. Although those two quoted comments were not made in the context of Cooley's termination, and they had been made a long time before he was dismissed, they do help to reveal Patrick's state of mind and reflect a deep-rooted, ongoing pattern that is anything but isolated. Moreover, the statements were offered under the hearsay exception that allows out-of-court statements made by party-opponents. Fed. R.Evid. 801(d)(2).

Beyond his own testimony, Cooley elicited other witnesses' comments that Patrick wanted a younger work force and felt uncomfortable around older people. Reddish, the former general manager who had been demoted by Patrick back to district manager, testified during a pre-trial deposition that Patrick had a phobia about getting old and that he feared that his sexual activities would

be adversely affected by the aging process. "There was hardly a meeting that I ever had with Mr. Patrick that something wasn't said about getting old, age, his—there was [sic] always sexual remarks about what age did to you. . . . [He] did not like older people, he didn't like to be around them, and he never . . . made any pretense about it. He just didn't like to be around older people." Reddish also testified that Patrick often spoke of three elderly employees that he kept on payroll as his "token senior citizens" whose presence would protect him from age-discrimination suits.

In addition, Cooley testified that Patrick had made comments to him about his white hair and to another Carmike division manager, James Zimmerman, about the "black gook" in Zimmerman's hair. Although Zimmerman referred to Cooley as "a weasel" during direct testimony on behalf of Carmike, the jury observed this exchange with Cooley's lawyer during the cross-examination:

Q. Mr. Zimmerman, you have changed since I have taken your deposition in this case, haven't you?

A. What way?

Q. Well, you used to have jet black hair when I took your deposition, and now, for some reason, you have let your hair grow and it's white. Is there something having to do with this case that's led you to do that, sir?

A. No, my hair was not jet black, because I had already started getting the coloring out of it. I got tired of putting it in about twice a week.

Q. Okay. But your hair was black when I took your deposition?

A. It was blacker than what it is, yeah. I guess it's got a little black in it now.

Furthermore, Melvin Cates, who replaced Cooley, testified that "it was brought out in conversations that I had with him at the time that Mike Patrick preferred younger people in supervisory positions like city manager and district manager."

In our review of any trial record, we are mindful that evidentiary questions often require a trial judge to make quick decisions on doubtful questions. That is why we review evidentiary decisions for abuse of discretion. Many evidentiary challenges do not have one "black-letter-law," right-or-wrong answer. Rather, they demand swift but judicious weighing and balancing. Indeed, because such questions are often subject to a judge's discretion, this court often would affirm a judge's evidentiary decision "either way," whether the response to the lawyer's objection had been "sustained" or "overruled."

In this case, in the context of this fact pattern, we find no abuse of discretion. The district judge was trying a case on age discrimination, and evidence was proffered to show a pattern of behavior that would meet the heavy evidentiary burden that ADEA plaintiffs must bear to prove that a defendant's alleged discriminatory animus was not vague, ambiguous, or isolated. *See, e.g., Phelps* and *Gagne, supra.* The judge admitted the testimony and, based on our careful review of the record below, his ruling on this question could have been affirmed "either way." His later comments regarding how he would hypothetically decide the question if he "had it to do over again" do not convert his actual courtroom decision, which we affirm, into reversible error. In this particular setting, either ruling could have been "right."

■ We agree with the district judge, moreover, that the error, if any, would have been harmless. The jury was presented with a very persuasive case and was posed very compelling questions to ponder: Why was Cooley fired? Because he placed a newspaper advertisement that comported with his district manager's instructions? Because he thought that, once again for another year, there would be no early matinee on Christmas Day? Because he obtained free AM radio advertising, along with the FM time that he had been authorized to purchase? Because he worked eighty hours a week?

We are persuaded by our review of the record that the jurors did not need to hear testimony about Patrick's alleged "grandmother" comment or a youthfully foolish "concentration camp" remark to believe Cooley's claim and to find that Carmike's explanations were pretextual. While Carmike's

witnesses told the jurors that Cooley's fate was not decided until the completion of a meticulous top-level investigation into the facts on January 2, 1989, Cates told them that he had already been designated on December 31, 1988, to replace Cooley. Cates's testimony thereby gave weight to Cooley's contention that the investigation, if it was even conducted, was merely pretextual. The newspaper advertising representative confirmed Cooley's story that he had frantically tried to amend the ad. The district manager, Cooley's immediate superior, came forward and told Eidson that the mix-up was not Cooley's fault, but his own.

Further fueling suspicion, Cooley elicited testimony from James Longworth, a coworker, who testified about a conversation he had with Mel Cates, Cooley's replacement:

> He said Mike Patrick wanted young people for the company, it was a young man's company and he felt that Mr. Cooley was fired over trumped-up [charges] and they had found an excuse and not a reason to fire him.

Longworth then proceeded to relate a conversation with division manager Zimmerman:

> Well, he said that Carmike Cinemas was a young man's company and people like me and Jerry, who was [sic] the people he was talking to at that time, definitely had a future with the company because we was [sic] young and they wanted to get rid of the older city managers.... And James [Zimmerman] had told us on numerous occasions to hang in there, that he was going to get Mr. Cooley fired, and if we had anything we could tell him to help him get him fired, if we had any reason, any problems, just to let him know.

A reasonable jury could have viewed the accumulated testimony as going beyond the vague, ambiguous, and isolated comments that have been held insufficient to support an age-discrimination claim. They were comments attributed to decision makers, related to the decision-making process, and quoted by co-workers who had these discussions with Cooley's superiors during the course of their employment at Carmike. Therefore, in light of the strength of Cooley's case, we are persuaded that, if there was error, it was harmless.

## III

■ Carmike asked for a jury instruction that would have required Cooley to prove "by a preponderance of the credible evidence that not only was age one factor that contributed to or affected the decision of Carmike to discharge him, but that age was a determining factor for his discharge, meaning that *but for* the motive to discriminate which Mr. Cooley claims existed against him, he would not have been discharged." (Emphasis added.) *See, e.g., Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979). However, the judge chose to instruct the jury with alternative language, drawn from this court's holding in *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317 (6th Cir.1975):

> [Y]ou are instructed that the plaintiff need not show that age was the sole or exclusive factor in Carmike's personnel decision. There could have been more than one factor which motivated the defendant. Nevertheless, the plaintiff is entitled to recover if he proves by a preponderance of the evidence that one such factor was his age and that the age factor made a difference in determining whether or not he was to be employed, whether he was or was not to be employed, to be exact.

Carmike appeals from the judge's jury instruction and supports its claim by citing cases in the First, Fifth, Seventh, and Eleventh Circuits. It also cites an unpublished Sixth Circuit opinion in 1991. However, the *Laugesen*-inspired text, which focuses the jury's attention on the need for age discrimination to have been "a"—not "the"—determining factor underlying the defendant-employer's adverse action against the plaintiff-employee, seems sufficient and unassailable. In fact, the *Laugesen* language, on which the district judge based his instruction, is especially appropriate because it was drafted by this court in response to an earlier appeal from jury instructions in an ADEA case. In *Laugesen*, this court specifically spelled out what it regarded as "essential for the jury to understand from the instructions." 510 F.2d at 317.

Indeed, it is not even clear that Carmike's proposed "but for" instruction differs from the *Laugesen* "determining factor" instruction in any substantive way. For example, in *Chappell v. GTE Products Corp.*, 803 F.2d 261, 265–66 (6th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987), this court referred interchangeably to both concepts. *See generally Danielson v. City of Lorain*, 938 F.2d 681 (6th Cir.1991) (articulating Sixth Circuit law that a plaintiff in an age discrimination case must show that age was "a determining factor" in the adverse employment decision); *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229–30 (6th Cir.1990) (same); *Moody v. Pepsi–Cola Metro. Bottling Co.*, 915 F.2d 201, 208 (6th Cir.1990) (same); *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1181 (6th Cir. 1983) (same).

Therefore, we find no error in the judge's decision to use the *Laugesen* instruction without incanting the words "but for."

### IV

■ Carmike also appeals from the amount of the jury award to Cooley. The jury, persuaded that Cooley was fired in violation of the ADEA and the THRA, awarded Cooley $116,363 in back pay, $249,741 in front pay,[4] $85,000 for mental distress, plus interest and costs. The district judge later assessed Carmike an additional $65,837 in attorney's fees and costs. Carmike claims that the front pay and the mental distress damages were excessive and reflect an inflamed jury. However, Carmike's argument on this point is only conclusory. The company simply argues that Cooley suffered no more than the injuries that are "normally associated with losing a job, i.e., overall disappointment about not being employed." This court has previously noted:

> Some of the factors which district courts have applied to alleviate the speculative nature of future damage awards include an employee's duty to mitigate, "the availability of employment opportunities, the period within which one by reasonable efforts

may be reemployed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards."

*Shore v. Federal Express Corp.*, 777 F.2d 1155, 1160 (6th Cir.1985) (quoting *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1168–69 (S.D.N.Y.1983)). In this case, Cooley was fifty-three years old when he was fired, and he had served one company for thirty-five years. After his termination, he made substantial efforts to find new work and sent resumes to employers in three cities, including Chattanooga. He took tests, interviewed with the City of Chattanooga, and sent out four or five resumes weekly. He eventually found work as a service technician in the maintenance department of a school.

In calculating the front pay award, the jury heard expert testimony that considered Cooley's salary and benefits at Carmike, his salary and benefits at his new place of employment, and his work life expectancy—all discounted to present value. Carmike has not presented alternative statistics.

■ With regard to his mental distress, Cooley, his wife, and his son testified to the dramatic impact that the termination had on him. He would drive aimlessly "up and down the road" or along the highway, without realizing what he had been doing. He would sit around, staring at the television without realizing what he had been watching. He had trouble eating and sleeping. His doctor gave him medication for hypertension. Although his counsel may exaggerate in claiming that he "lived as a man who had been given the death sentence for a parking violation," he clearly suffered more than the injuries that are "normally associated with losing a job, i.e., overall disappointment about not being employed."

"[A] jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's

---

4. Carmike's brief states in two different places that they have been assessed $294,741 in future pay. Appellant's Brief at 4, 28. There is nothing in the record to support this higher figure, and it may have emerged from a scrivener's error in transposing the digits "4" and "9."

loss." *Green v. Francis,* 705 F.2d 846, 850 (6th Cir.1983). In *Moody,* 915 F.2d at 211, this court upheld a $150,000 emotional distress award for the victim of an ADEA violation. In this case, the jury's $85,000 emotional distress award does not seem beyond the maximum that the jury could reasonably find to be compensatory for the suffering that Cooley has endured.

## V

For the foregoing reasons, the judgment of the district court is AFFIRMED.