RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0012p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CASSANDRA THOMPSON,

  *Plaintiff-Appellant*,

  *v.*

FRESH PRODUCTS, LLC; DAWN SHAFERLY,

  *Defendants-Appellees*.

No. 20-3060

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:18-cv-01243—Jack Zouhary, District Judge.

Argued: July 28, 2020

Decided and Filed: January 15, 2021

Before: GUY, BOGGS, and WHITE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Daniel S. Dubow, THE SPITZ LAW FIRM, LLC, Beachwood, Ohio, for Appellant. Carrie L. Urrutia, EASTMAN & SMITH LTD., Toledo, Ohio, for Appellees. James M. Tucker, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Daniel S. Dubow, Brian D. Spitz, THE SPITZ LAW FIRM, LLC, Beachwood, Ohio, for Appellant. Carrie L. Urrutia, Emilie K. Vassar, EASTMAN & SMITH LTD., Toledo, Ohio, for Appellees. James M. Tucker, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

  BOGGS, J., delivered the opinion of the court in which GUY, J., joined, and WHITE, J., joined in all but Section III(C)(1) of the majority opinion. WHITE, J. (pp. 23–25), delivered a separate opinion concurring in part and dissenting in part.

—————————————

**OPINION**

—————————————

BOGGS, Circuit Judge.    Plaintiff Cassandra Thompson brought this employment-discrimination action against her former employer, Fresh Products, LLC, and the human-resources manager of Fresh Products, Dawn Shaferly (together, "Fresh Products"), after she was laid off as part of a reduction-in-force.  Thompson alleged disability discrimination, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12117; age discrimination, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634; race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2–2000e-5; and disability and race discrimination, in violation of Ohio law, Ohio Rev. Code §§ 4112.01–4112.99.  The district court granted summary judgment to Fresh Products on all claims, and Thompson appealed.

Because Thompson has not established a prima facie case of discrimination, we affirm the district court's grant of summary judgment.

## I. BACKGROUND

### A.  Facts

Thompson is African-American and was fifty-two years old at all times relevant to this appeal.  Thompson has arthritis, which affects her knees, back, and neck and restricts her from doing heavy lifting.  Because of her inability to do heavy lifting, her doctor gave her weight restrictions at one of her previous jobs, and she sought work "that doesn't require heavy lifting."  Thompson testified that she receives treatment for her arthritis, including injections, pain medication, and pain cream, and that her arthritis inhibits her ability to "[l]ive a full life."  She testified that she was approved for Social Security Disability (SSD) payments in 2014 based on a primary disability of morbid obesity and a secondary disability of arthritis.[1]

—————————————

[1]Thompson was no longer morbidly obese at the times relevant to this litigation.

Fresh Products manufactures odor-control products and has a production facility in Perrysberg, Ohio. Most of its employees are entry-level production workers. According to Fresh Products' job description, production workers perform "assembly-type functions . . . utilizing various light equipment and machinery." Production workers must be able "to stand on feet for up to 10–12 hours at a time, and to occasionally reach, bend, kneel, grasp, walk, or carry."

Fresh Products hired Thompson as a production worker in July 2016, after she interviewed with Shaferly, Fresh Products' human-resources manager, at a hiring event. Thompson did not mention her arthritis diagnosis to Shaferly during her interview.

As a new hire, Thompson signed a "Handbook Acknowledgment," which stated:

> I understand that this handbook does not imply or constitute a contract or employment agreement between Fresh Products and me. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it. . . .

> I understand that this handbook contains general statements about current Company policy, and that Fresh Products retains the right to revise or modify the terms, information, policies, and benefits at its sole discretion and at any time. I understand that the Company may, at its sole discretion, depart from policy from time to time. . . .

> In consideration of my employment or continued employment, I agree that any claim or lawsuit arising out of my employment with Fresh Products must be filed no more than six (6) months after the date of the employment action that is subject [sic] of the claim or lawsuit. While I understand that the statute of limitations for claims arising out of an employment action may be longer than six (6) months, I agree to be bound by the six (6) month period of limitations set forth herein and I waive any statute of limitations to the contrary. Should a court determine in some future lawsuit that this provision allows an unreasonably short period of time to commence a claim or lawsuit, the court shall enforce this provision as far as possible and shall declare the lawsuit barred unless it was brought within the minimum reasonable time within which the claim or suit should have been commenced.

When Thompson was hired, Fresh Products operated on a schedule of three eight-hour shifts per day. Thompson initially worked on the first shift, but after two months she requested, and was given, a position on the third shift. She did not have restrictions on her ability to work and was able to perform her job duties without accommodations.

Thompson testified that in October 2016, she spoke with her supervisor, Kevin Hartman, and "brought it to his attention [she] was having some issues with [her] medical condition." She testified that she mentioned the possibility of doing part-time work, and that Hartman told her he thought it was "a good idea" and that he would "speak to someone." Thompson testified that she did not hear back from Hartman about her request and that she brought it up to Shaferly later in October when Shaferly was on the production workers' floor. She testified that she told Shaferly she would like to go part time "to get some work done on [her] back," and that Shaferly responded that she would get back to her. According to Thompson, Shaferly also said that she thought going part time was "a good idea" because "work probably wouldn't pick up [until] mid February." Thompson testified that she did not provide Hartman or Shaferly with medical documentation of her condition and did not have any other conversations with them about her request. Hartman testified that he has no recollection of Thompson raising the possibility of part-time work in October 2016, or ever mentioning her arthritis or pain at work. Shaferly also testified that Thompson did not ask about part-time work in October. She further testified that Thompson never told her about her arthritis and never stated that she experienced pain at work because of her arthritis. In any event, Thompson continued to work full time.

Toward the end of 2016, Fresh Products began experiencing a reduction in sales. Rather than reducing employees' hours, management decided to move to a schedule of two ten-hour shifts and reduce the number of workers. On December 8, management held an all-employees meeting to inform employees about the upcoming shift change. They did not discuss layoffs during the meeting because they hoped to minimize the number of workers, if any, who would be laid off by choosing not to fill the positions of employees who quit or were terminated before the shift change took effect. Shaferly told the employees at the meeting that management "want[ed] to get feedback," and asked all employees to fill out a survey about the new shifts. The survey asked employees two questions: first, whether they could work four ten-hour shifts per week, and if not, why; and second, which of the two ten-hour shifts they preferred.

Thompson indicated on the survey that she was unable to work the new schedule but did not provide an explanation. Thompson later testified that she did not believe the new shifts would work for her because the schedule interfered with the hours she had committed to taking

care of her grandchildren. She did not communicate this to anyone at Fresh Products, and she says this schedule difficulty was not connected to her earlier request to work part time, which was due to her disability. Many other employees also responded that they could not work the new shifts "for a variety of reasons."

On December 14, Hartman sent Shaferly an email asking if Fresh Products was "offering part time work" and stating, "I have at least 2 employees that keep asking." Shaferly responded, "I only know of 1 employee, Kristen Brown, who requested part time so she could go to school." Shaferly added that she spoke to Brown, and Brown said yes to the later of the two shifts even though she didn't believe it would work for her. Shaferly testified that she did not look into whether Brown, a white woman in her early twenties, could work part time, but only asked her whether either of the new shifts could possibly work with her class schedule. She also explained that Brown had tried to work through the shift changes but ended up leaving Fresh Products that winter.

Hartman responded that "Cassandra [Thompson] continues to ask." No response from Shaferly to Hartman's second email is in the record. Hartman remembered at his deposition that Thompson was one of the employees who asked him about part-time hours after the December meeting, but he could not remember why.

In early December, Fresh Products asked its shift supervisors to create a list of employees recommended for layoffs, which management reviewed and used to make final decisions about who would be laid off. Thompson was on the list of those recommended for layoff from the third shift. On December 16, Shaferly emailed Fresh Products' leadership about the shift supervisors' recommendations, stating that she "ha[d] two questions about the final names." She noted that Thompson and another employee "both have pretty high productivity, low absenteeism" and suggested that they "take them off the layoff list temporarily, until we see who exits once we announce the actual hours."

When management decided that the hours for the new shifts would differ from what they had initially discussed with employees, Shaferly conducted a second, oral survey asking

employees about their shift preferences.[2]  Shaferly testified that she believes this was the first time she spoke with Thompson about working part time, and that when she asked Thompson which shift she preferred, Thompson responded, "[p]art-time."  Shaferly asked Thompson to explain what she meant, and Thompson stated, "[l]ike 12:00 to 6:00 [AM] or 12:00 to 6:30 [AM]."  Shaferly testified that Thompson did not explain why she wanted to work part time but that she "assume[d] she wanted part-time because she was working an eight-hour day and we were going to ten-hour days.  So in my mind, I was thinking she doesn't want to work ten straight hours, but she never said that."  Shaferly testified that she spoke to every employee and Thompson was the only one who did not indicate a shift preference.

Shaferly did not look into whether Thompson could work part time because Fresh Products does not have part-time employees.  She testified that other than office staff, there was only one employee, Travis Brunt, who worked part time.  Brunt, a white man in his twenties, worked three shifts per week because he worked another job.  Brunt worked in the "para department," which operates a different product line from production, requires different skills, and does not always operate on the same schedule.

Sometime after Shaferly conducted the second survey, she finalized the list of employees to consider for layoffs.  Thompson was on the list with the note "Wants PT."

Management held another all-employee meeting on January 12, 2017, where they told employees that the new shift schedule would begin on January 29, and that five to ten people would be laid off.  The next day, Shaferly informed those employees, including Thompson, that they would be laid off on January 27.  Thompson testified that Shaferly asked her to come into her office and then explained to her that she would be "permanently laid off" "because we're moving to two shifts," and that Thompson's "name stuck out because [she] asked to go part time."

There were four other employees who responded "no" to the survey and did not select a shift preference.  Shaferly testified that at least two of those employees, India Overton and

---

[2]Initially, Fresh Products considered changing to a system with first shift, from 6:00 AM to 4:30 PM, and second shift, from 4:30 PM to 3:00 AM.  Instead, the new shifts became A Shift, from 8:00 PM to 6:30 AM, and B Shift, from 6:30 AM to 5:00 PM.

Tavares Gill, were not laid off and did not quit before the shift change. Shaferly further explained that Thompson was the only employee who stated she could not work the new hours and *never* selected a shift preference—either on the survey or orally—but did not quit before the shift change.

Thompson was laid off on January 27. Four other employees were laid off as well: Constance Kanary, a white woman between fifty-three and fifty-five, was laid off because she informed management that she was going to be incarcerated in February; Tabitha Wilson, a black woman in her late forties or early fifties, was laid off due to low productivity; Brenda Watt, a black woman in her early fifties, was also laid off due to low productivity; and Israel Diaz, a forty-five-year-old Hispanic man, volunteered to be laid off. All were offered a $500 severance payment conditioned on signing a release. Thompson did not sign the release and did not receive a severance payment.

## B. Procedural History

On February 1, 2017, Thompson filed a charge of discrimination with the Ohio Civil Rights Commission (OCRC).[3] Thompson claimed that Fresh Products' failure to grant her request for part-time work constituted disability discrimination and that she was laid off in part because of her disability. She also claimed that she was laid off in part because of her age and race. On September 28, 2017, OCRC issued a letter of determination dismissing Thompson's charge based on a finding of no probable cause. The OCRC found that Thompson had been lawfully "laid off because she failed to select a preference for a new shift" and found "no information which supports [Thompson] was denied reasonable accommodation." Thompson timely requested reconsideration, and, after review, OCRC again made a finding of no probable cause. On March 6, 2018, the EEOC issued Thompson a dismissal and right-to-sue letter stating that it had adopted OCRC's findings and notifying Thompson that she had ninety days to sue under Title VII, the ADA, or the ADEA.

---

[3]The charge was simultaneously filed with the EEOC. In Ohio, charges of discrimination with the OCRC are "dual filed," meaning that OCRC forwards a copy of the charge to the EEOC, which then opens its own file for the charge. *See Ross v. ITT Cleveland Motion Control*, 2010 WL 779999, at *3 (N.D. Ohio Mar. 2, 2010).

Thompson brought this lawsuit against Fresh Products eighty-seven days later.  She alleged that Fresh Products laid her off because of her age, race, and disability, in violation of the ADEA, Title VII, and the ADA, and that Fresh Products failed to provide her with a reasonable accommodation in violation of the ADA.  Thompson also brought disability and race-discrimination claims under Ohio Revised Code §§ 4112.01–4112.99.

The district court granted summary judgment to Fresh Products on all claims.  The district court found that Thompson's ADEA and ADA claims were untimely because the Handbook Acknowledgment obligated Thompson to bring those claims within six months of her termination.  The court also determined that Thompson had failed to establish a prima facie case of discrimination on any of her claims.  Thompson appeals.

## II.  STANDARD OF REVIEW

We review a grant of summary judgment de novo.  *1st Source Bank v. Wilson Bank & Trust*, 735 F.3d 500, 502 (6th Cir. 2013).  Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party."  *1st Source Bank*, 735 F.3d at 502.  However, the non-moving party must present more than "a scintilla of evidence in support of [its] position . . . ; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.  DISCUSSION

### A.  Timeliness

#### *1.  Timeliness of Federal Claims*

Fresh Products argued before the district court that all of Thompson's claims were untimely because, by signing the Handbook Acknowledgment, Thompson agreed to be bound by a six-month limitations period for any claim or lawsuit arising out of her employment with Fresh Products and waived any statute of limitations to the contrary.

While Fresh Products' summary-judgment motion was pending, we issued our opinion in *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824 (6th Cir. 2019). In *Logan*, we were presented with the question of whether Title VII's statute of limitations may be contractually shortened. *Id.* at 825. Like Thompson, the plaintiff in *Logan* signed an agreement as a condition of employment, stating "that any claim or lawsuit arising out of [her] employment . . . must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit" and "waiv[ing] any statute of limitations to the contrary." *Id.* at 826. The plaintiff filed a sex-discrimination charge with the EEOC more than six months after she was allegedly constructively discharged from her job. *Ibid.* The EEOC issued the plaintiff a right-to-sue letter several months later, and, 440 days after the alleged constructive discharge, the plaintiff brought a civil action against her employer for sex discrimination under Title VII, which the employer challenged as untimely. *Ibid.*

In deciding whether the contractual limitation rendered the claims untimely, we first discussed the usual processes and time limitations for filing a charge and bringing suit under Title VII. *Id.* at 827–31. We noted that by requiring employees to file charges with the EEOC before involving the federal courts, "Congress chose '[c]ooperation and voluntary compliance . . . as the preferred means' for eradicating workplace discrimination" and "established a procedure whereby . . . the [EEOC] would have an opportunity to investigate individual charges of discrimination, to promote voluntary compliance with the requirements of Title VII." *Id.* at 828 (alterations in original) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)). We explained that these "cooperative mechanisms" had important implications for an employee bringing a claim under Title VII:

> She must first wait (during the EEOC's 180-day period of exclusive jurisdiction) and then hurry (once the EEOC issues her a right-to-sue letter, she only has ninety days to file her claim). Any alterations to the statutory limitation period necessarily risk upsetting this delicate balance, removing the incentive of employers to cooperate with the EEOC, and encouraging litigation that gives short shrift to pre-suit investigation and potential resolution of disputes through the EEOC and analog state and local agencies.

*Id.* at 829. We also noted that, in addition to disrupting these procedural mechanisms, allowing contractual abrogation of Title VII's limitation period "would frustrate the uniform application of Title VII" nationally. *Id.* at 833.

We then turned to the significance of Title VII's self-contained limitations period, recalling the long-standing principle that "where 'the statute creating a cause of action also fixes a limitation of time in which an action may be brought, the limitation is regarded as a part of the substantive law of the cause of action.'" *Id.* at 829 (quoting *Myers v. Alvey-Ferguson Co.*, 331 F.2d 223, 224 (6th Cir. 1964)). Based on these considerations, we held that the limitations period created by Title VII is a substantive right that may not be prospectively waived. *Ibid.*

Importantly, we distinguished cases holding that contractual limitation periods were valid. In *Thurman v. DaimlerChrysler*, 397 F.3d 352, 358–59 (6th Cir. 2004), this court upheld a contractual limitation period as it pertained to a claim brought under 42 U.S.C. § 1981. We explained in *Logan* that the crucial difference between § 1981 and Title VII is that the former "does not have a self-contained limitation period or an extensive procedure for bringing suit." 939 F.3d at 830. We similarly distinguished *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99 (2013), where the Supreme Court upheld contractual limitations in the ERISA context. *Logan*, 939 F.3d at 830. We reasoned that, unlike Title VII, ERISA "does not create substantive rights but instead regulates retirement benefit contracts." *Ibid.*

The district court here held that although *Logan* rendered the Handbook Acknowledgment's shortened time period inapplicable to Thompson's Title VII claim, *Logan*'s reasoning did not extend to Thompson's ADA and ADEA claims, and those claims were therefore time-barred under the Handbook Acknowledgment's valid contract provision. We disagree. Reviewing *Logan* with the ADA and ADEA in mind, we conclude that the considerations that guided our decision in that case apply with equal force in the ADA and ADEA contexts.

> The ADA expressly incorporates Title VII's procedures, limitations period, and remedies:

> The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General,

or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a). Thus, in enacting the ADA, Congress established "cooperative mechanisms" intended to promote "voluntary compliance" as the primary means of eradicating discrimination in the workplace—just as it did when enacting Title VII. *Logan*, 939 F.3d at 828, 829. And as under Title VII, an employee bringing a claim has 180 (or 300) days after an adverse employment action to file a charge with the EEOC.**[4]** 42 U.S.C. § 2000e-5(e). Then she must wait 180 days for the EEOC's period of exclusive jurisdiction to pass. *Id.* § 2000e-5(f)(1). After she receives a right-to-sue letter, she has 90 days to file suit. *Ibid.* As in the Title VII context, permitting parties to shorten the period in which an employee may bring a civil action under the ADA risks "removing the incentive of employers to cooperate with the EEOC," undermining the value of pre-suit cooperative processes, and frustrating the uniform application of the statute. *Logan*, 939 F.3d at 829.

Moreover, we have made clear that "where statutes that create rights and remedies contain their own limitation periods, the limitation period should be treated as a substantive right" which may not be waived. *Ibid.* (citing *Davis v. Mills*, 194 U.S. 451, 454 (1904) ("The common case [in which a limitation of time is part of the substantive right created by a statute] is where a statute creates a new liability, and in the same section or in the same act limits the time within which it can be enforced.")). Because it incorporates Title VII's self-contained limitations period, the ADA's time limitation is a substantive right that may not be waived.

Although the ADEA does not incorporate Title VII's procedures and time limitations, it is like Title VII in all the respects that the *Logan* court deemed significant. First, it includes a self-contained limitation period: a person alleging unlawful age discrimination must file a charge with the EEOC "within 180 days after the alleged unlawful practice occurred."**[5]**

---

**[4]**If the plaintiff resides in a state that is a "deferral jurisdiction," meaning the jurisdiction has a law prohibiting the alleged misconduct and an agency capable of granting or seeking relief from the conduct, she has 300 days to file a charge. *Logan*, 939 F.3d at 827. Ohio is a deferral jurisdiction.

**[5]**Like Title VII and the ADA, the ADEA provides for an extended limitation period of 300 days for filing a charge in states that prohibit discrimination based on age and have an agency with "authority to grant or seek relief from such discriminatory practice." 29 U.S.C. § 633(b).

29 U.S.C. § 626(d)(1)(A).  After filing a charge, a person must wait sixty days to bring a civil action, *id.* § 626(d)(1), or, if she waits for a right-to-sue letter, must bring such an action within 90 days of receiving it, *id.* § 626(e).  These provisions are part of the substantive law of the cause of action created by the ADEA.  *See Logan*, 939 F.3d at 829.

And like Title VII, the ADEA emphasizes the importance of the pre-suit cooperative process, outlining the EEOC's obligation upon receiving a charge to "seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." 29 U.S.C. § 626(d)(2).  Altering the time limitations surrounding these processes risks undermining the statute's uniform application and frustrating efforts to foster employer cooperation.  *See Logan*, 939 F.3d at 829–33.

The ADEA's waiver provision further supports the conclusion that, as a substantive right, its self-contained limitation period may not be prospectively waived.  It provides that "[a]n individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary."  29 U.S.C. § 626(f).  A waiver may not be "knowing and voluntary" if it includes waiver of "rights or claims that may arise after the date the waiver is executed."  *Id.* § 626(f)(C).  The statute's strict limitations on waivers align with "the general rule in this circuit that an employee may not prospectively waive his or her rights under either Title VII or the ADEA."  *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1995).

Based on these considerations, we hold that the limitations periods in the ADA and ADEA give rise to substantive, non-waivable rights.  Because Thompson brought a charge within five days of her termination and filed this lawsuit within ninety days of receiving her right-to-sue letter, her Title VII, ADA, and ADEA claims are timely.

### 2. *Timeliness of OCRA Claims*

The six-month contractual limitation period is valid with respect to Thompson's state-law claims brought under Ohio Revised Code §§ 4112.01–4112.99.  Because Ohio Revised Code § 4112.99 does not specify a statute of limitations for civil actions alleging disability or race discrimination, the state's general six-year statute of limitations ordinarily applies.  *Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.*, 638 N.E.2d 991, 992–94 (Ohio 1994).  However, federal

courts have upheld contractual limitations periods on employment-discrimination claims brought under Ohio law, and we find no reason not to do so here. *Terry v. Cent. Trans., Inc.*, No. 1:09 CV 2432, 2011 WL 3296852, at *5 (N.D. Ohio July 29, 2011). Thompson points to the provision in the Handbook Acknowledgment that states that the handbook is not a contract to support her argument that she is not bound by the Acknowledgment. But, as the district court correctly noted, it is the Acknowledgment—not the non-binding handbook—that contains the limitation. Accordingly, we find that Thompson is bound by the contractual six-month limitation period in the Handbook Acknowledgment with respect to her OCRA claims. That period expired on July 27, 2017, and Thompson did not bring this action until May of 2018. Her state claims were therefore untimely.

## B. Discrimination Analysis

In the absence of direct evidence of discrimination, we apply the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to evaluate workplace-discrimination claims. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017); *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003); *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir. 1994). Under this framework, the plaintiff must first establish a prima facie case of discrimination, which requires her to show that: "(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by a person outside of the protected class." *Carter*, 349 F.3d at 273 (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997)). Where, as here, an employee is laid off as part of a reduction-in-force (RIF),[6] the fourth requirement is modified and, rather than showing that she was replaced, the plaintiff must present "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

---

[6]A RIF occurs when an employer eliminates an employee's position because of business considerations and does not replace that employee after her discharge. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). It is undisputed that Fresh Products reduced its number of employees due to a decrease in sales and that it did not replace the employees it laid off.

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. *Cooley*, 25 F.3d at 1329. If the employer meets its burden, the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful discrimination. *Ibid.* To establish pretext, a plaintiff may show that the defendant's reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Carter*, 349 F.3d at 274 (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003)).

### C. Disability Discrimination

#### 1. Disability Discrimination Claim

To establish a prima facie case of disability discrimination, Thompson must first show that she is disabled under the ADA and that "her employer 'knew or had reason to know' of her disability." *Williams*, 847 F.3d at 395 (quoting *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011)).

A person is disabled under the ADA when the person has "a physical or mental impairment that substantially limits one or more major life activities," has "a record of such impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include "walking, standing, lifting, bending, . . . and working." *Id.* § 12102(2)(A). An employee is *regarded as* having a disability "if the [employee] establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.*"[7] *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) (quoting

---

[7]Before 2008, a person was regarded as having a disability if "(1) [the employer] mistakenly believe[d] that [the employee] ha[d] a physical impairment that substantially limit[ed] one or more major life activities, or (2) [the employer] mistakenly believe[d] that an actual, nonlimiting impairment substantially limit[ed] one or more major life activities." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (alterations in original) (quoting *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999)). In 2008, Congress amended the ADA to broaden its scope of protection and adopted the definition of "regarded as" that we apply today. *Ibid.* (citing the Americans with Disabilities Amendments Act, Pub. L. 110-325, § 2(a)(4), 122 Stat. 3553 (2008)). The district court incorrectly applied the pre-2008 definition in evaluating Thompson's disability-discrimination claims.

42 U.S.C. § 12102(3)(A)).  The definition of disability must be construed broadly.  42 U.S.C. § 12102(4)(A).

The district court found that Thompson failed to establish that she has a disability because she relied on "conclusory statements," did not have any lifting restrictions while at Fresh Products, and continued to work full-time until she was laid off.  But Thompson's lack of lifting restrictions and her ability to work full-time while at Fresh Products are not dispositive; the relevant question is whether, at the time of her termination, she had an impairment that substantially limited her life activities, had a record of such an impairment, or was regarded as having one.  42 U.S.C. § 12102(1).

Fresh Products argues that Thompson has failed to provide any examples or details regarding how her arthritis impacts her life beyond her testimony that it inhibits her ability "to live a full life."  Fresh Products dismisses Thompson's testimony that her arthritis causes her pain and restricts her ability to do heavy lifting, which, in turn, affects her ability to do some jobs.  Although she was not doing heavy lifting at Fresh Products, her doctor gave her lifting restrictions at a previous job.  This evidence is sufficient to establish a fact dispute regarding whether Thompson has an impairment that substantially limits one or more of her major life activities, and therefore whether she is disabled under the ADA.

Similarly, Thompson has established a fact dispute with respect to whether she was regarded as having a disability.  She testified that she told Hartman that she wanted part-time work because she was having issues with her medical condition and that she told Shaferly that she wanted to go part-time so that she could have work done on her back.  Fresh Products disputes this, noting that Hartman and Shaferly testified that they did not recall those conversations. For summary-judgment purposes, the "function [of the courts] is not . . . to weigh the evidence" or "determine the truth," but merely to determine if there is an issue for trial. *Anderson*, 477 U.S. at 249.  If Thompson's testimony is believed, a jury could find that Thompson's superiors perceived that she had a physical impairment, "whether or not the impairment limit[ed] or [was] perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A). Based on the same evidence, Thompson has established a fact dispute regarding whether Fresh Products knew of her disability.

Thompson has also established a fact dispute regarding whether she was qualified for her position. An employee is qualified for her position if she can perform the essential functions of her job with or without a reasonable accommodation. *Williams*, 847 F.3d at 391 (citing 42 U.S.C. § 12111(8)). It is undisputed that Thompson worked full-time until her termination, and Thompson testified that she had no restrictions affecting her ability to do her job at Fresh Products. Nonetheless, Fresh Products argues that Thompson was not qualified because she would have been unable or unwilling to work a full ten-hour shift under the new schedule, and working a full shift is an essential function of the production worker role. Thompson counters that she never told Shaferly she could not work the new shift—whether because of her disability or for another reason—and that she merely expressed a preference to work part-time. Shaferly admitted in her testimony that Thompson did not tell her she was unable to work four ten-hour shifts per week; instead, she told Shaferly she *wanted* part-time hours. Shaferly also explained that when she first asked employees to fill out the survey indicating their shift preferences and availability, she communicated that management was trying "to see what [employees] prefer." Thus, a jury could determine that Thompson's survey response was merely an indication of her preferences. And because Thompson worked eight-hour shifts without accommodations, a jury could also conclude that despite her survey responses, she could have continued to work full-time and was thus qualified for the job.

Because the parties do not dispute that Thompson was subjected to an adverse employment action, the only remaining question regarding her prima facie case is whether she has provided "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out . . . for discharge for impermissible reasons." *Barnes*, 896 F.2d at 1465. Because Thompson did not provide evidence indicating she was singled out, she has not established a prima facie case of disability discrimination.

To prove her disability was a reason for her discharge, Thompson points to the retention of Alex Aliemenious and five other employees, arguing that they were worse workers, yet they were retained. Shaferly testified that Aliemenious does not have a disability, and she does not know of any of the other five individuals having a disability. But this is not an appropriate comparison because the undisputed evidence shows that Thompson was *not* fired for

productivity problems or absenteeism. Rather, she was let go after a survey process asking who could or would work the new shifts. It is possible the process was completed sloppily (since we do not know, for instance, why Tavares Gill or India Overton were retained) but it is not enough to "tend to indicate that [Fresh Products] singled out [Thompson] for discharge for impermissible reasons." *Ibid.* This is especially so since any miscommunication seems to have been by both parties here.

In particular, Thompson does not allege that she *ever* told management that she would work the 10-hour shifts. She now implies that she would have done so, contrary to her statements that she needed specific restricted work hours to care for grandchildren. Thompson was the only employee who stated she could not work either shift, never selected a preference for one of the shifts when Shaferly followed up after the survey, and did not voluntarily quit.**[8]** Aliemenious was retained and worked the 10-hour shifts. Gill and Overton, despite any check marks on an informal chart reflecting survey results, similarly worked the new hours. And while Brown initially requested part-time work, she did indicate a preferred shift orally and did work the new hours before leaving Fresh Products that winter.

Thus, Thompson has not shown that the circumstances surrounding the retention of these employees indicate she was singled out due to her disability. Accordingly, we affirm the district court's grant of summary judgment to Fresh Products on Thompson's ADA discrimination claim.

### 2. *Failure to Accommodate Claim*

Thompson also argues that Fresh Products is liable under the ADA for failing to engage in an interactive process after she notified Hartman and Shaferly that she wanted to work part time due to her disability. "The duty to engage in the interactive process with a disabled employee is mandatory and 'requires communication and good-faith exploration of possible

---

**[8]**Shaferly testified that Thompson was selected for layoff "because she didn't choose a shift on either of the surveys," and that when Shaferly was walking around the floor and asked Thompson which of the new shifts she would prefer, Thompson said "part-time" "[l]ike 12:00 to 6:00 [AM] or 12:00 to 6:30 [AM.]" In the "notes" column of the list of employees considered for layoff, it says "Wants PT" next to Thompson's name. Shaferly's asserted belief that Thompson could not or would not work full time on one of the new shifts provides a legitimate, non-discriminatory reason for laying her off as part of the RIF.

accommodations.'" *Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007)). In this circuit, failure to engage in the interactive process does not give rise to an independent claim. *Ibid.* Instead, it is a violation of the ADA only if the plaintiff establishes a prima facie case of failure to accommodate. *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).

To do so, Thompson must first show that she requested a reasonable accommodation and that Fresh Products failed to provide it. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011). The parties agree that Thompson asked to work part-time and did not request other accommodations. However, they dispute whether the part-time request constituted a request for a reasonable accommodation within the meaning of the ADA. The burden is on Thompson to show that her proposed accommodation was objectively reasonable. *Kleiber*, 485 F.3d at 870.

A request for an accommodation is unreasonable "if it requires eliminating an 'essential' function of the job." *Rorrer*, 743 F.3d at 1039 (citing 29 C.F.R. § 1630.2(o)). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Ibid.* (quoting *Keith*, 703 F.3d at 926). The ADA directs that in determining whether a job function is essential, "consideration shall be given to the employer's judgment" and any written description of the job prepared by the employer. 42 U.S.C. § 12111(8). Courts should also consider "[t]he consequences of not requiring the [employee] to perform the function" and the work experience of past employees in the same or similar jobs. *Rorrer*, 743 F.3d at 1039 (quoting 29 C.F.R. § 1630.2(n)(3)).

The record shows that working full shifts is an essential function of the production-worker job. Although the handbook does not state that employees must work full time, it states that production workers must be able to work 10–12 hours at a time—at least the length of a full shift. Shaferly testified that Fresh Products does not have part-time production workers because it is too difficult to manage with the amount of turnover at the company, and Hartman testified that it would be very difficult to have someone leave in the middle of a shift because it would require "figur[ing] out how to move someone else to take their spot" or "cover [their] machine."

The other production worker who inquired about part-time work, Kristen Brown, was not allowed to work part time, and Shaferly testified that she never looked into Brown's request.

Thompson points out that another worker, Travis Brunt, worked part time to accommodate a second job. However, Brunt worked in the para department, which has only five employees, operates on a one-shift schedule, and requires more experience. Moreover, Brunt did not work partial shifts as Thompson requested, but instead worked three full shifts per week. This evidence is insufficient to establish a fact dispute as to whether working full shifts was an essential function of the production-worker job.

Because the evidence shows that working a full shift was an essential function of Thompson's job, Thompson has not shown that she requested a reasonable accommodation and has not established a prima facie claim of failure to accommodate. We therefore affirm the district court's grant of summary judgment to Fresh Products on Thompson's failure-to-accommodate claim.

**D. Age Discrimination**

The ADEA prohibits discharging an employee "because of" her age. 29 U.S.C. § 623(a)(1). The plaintiff bears the burden of showing that age was the but-for cause of the termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009). As discussed above, Thompson was subjected to an adverse employment action and has established a fact dispute as to whether she was qualified for her position. Thompson is also a member of a protected class for purposes of her age-discrimination claim because she was over forty at the time of the adverse action. *Cooley*, 25 F.3d at 1329. To establish her prima facie case, Thompson must also provide "additional direct, circumstantial, or statistical evidence" showing that Fresh Products targeted her for discharge because of her age. *Barnes*, 896 F.2d at 1465.

Thompson offers the following as statistical evidence in support of her claim: 1) all employees laid off as part of the RIF were over 40, and their average age was 50; 2) the average age of those considered for termination was 45.76; and 3) the average age of those retained was 35.66.

To create an inference of discrimination, "statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Peeples v. City of Detroit*, 891 F.3d 622, 365 (6th Cir. 2018) (quoting *Barnes*, 896 F.2d at 1466). We have upheld inferences of discrimination where data are offered alongside analyses describing their statistical significance. *See ibid.*; *Barnes*, 896 F.2d at 1462–63. We have also discussed the importance of sample size, finding relatively small sample sizes to be suspect and incapable of supporting an inference of discrimination. *Compare Peeples*, 891 F.3d at 635 (finding a sample size of 27 to be insufficient), *and Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (finding a sample size of 17 to be "suspect"), *with Barnes*, 896 F.2d at 1462–63, 1467 (finding sample sizes of 153 and 165 employees sufficiently reliable).

Thompson has not provided any analysis explaining the statistical significance of the data she offers, and the sample size of five terminated employees is too small to provide reliable data. It is even smaller if one excludes the employee who volunteered for the layoff and the employee who was laid off because of her impending incarceration. Thus, the statistics Thompson offers cannot overcome the most obvious explanations for the layoffs, which, for the remaining terminated employees, Brenda Watt and Tabitha Wilson, are low productivity and poor attendance.

Thompson offers additional circumstantial evidence. Thompson points out that Alex Aliemenious, who was twenty-one at the time of the RIF, was retained despite having lower productivity and higher absenteeism than she did. The probative value of this evidence in the age-discrimination context is undermined by the fact that, according to the final list of those considered for layoff (excluding those who quit or were terminated for cause before the layoff), half of the other employees who had lower production numbers or higher absenteeism than Thompson and were retained were members of the protected class (i.e., forty or older), and two were older than Thompson at the time of the RIF. This evidence does not tend to show that Thompson was singled out because of her age.

Finally, Thompson argues that Fresh Products' retention of Kristen Brown, who also asked for part-time work (but did not receive it) and was in her early twenties, is evidence of age discrimination. However, the retention of an employee younger than a competent plaintiff is

insufficient to establish a prima facie case of age discrimination in the RIF context. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010) (collecting cases). If Thompson could show that she was more qualified than Brown or "that [Fresh Products] made statements indicative of a discriminatory motive," Brown's retention might serve as evidence that Thompson was singled out because of her age. *Barnes*, 896 F.2d at 1466. But Thompson does not claim that her qualifications were superior to Brown's, nor does she present other evidence of discriminatory motive related to age. Thus, the fact that Brown was retained does not establish a dispute of fact regarding whether Thompson was singled out because of her age.

We therefore affirm the district court's grant of summary judgment to Fresh Products on Thompson's ADEA claim.

**E. Race Discrimination**

Thompson's prima facie case of racial discrimination hinges on whether she has provided additional statistical or circumstantial evidence indicating that Fresh Products singled her out because of her race.

Thompson provides the following statistics to support her claim: 1) with the exception of Constance Kanary, who informed Fresh Products that she would be incarcerated, the five employees terminated as part of the RIF were all black, Hispanic, or biracial; and 2) of the 18 people considered for layoff, 78% were black. These statistics suffer from the same shortcomings as those provided in support of Thompson's ADEA claim: the sample sizes are too small to be reliable, and Thompson has failed to provide any analysis of the statistics' significance. They also do not address a comparison to the relevant pool: roughly 70% of Fresh Products' employees are black, Hispanic, or biracial.[9]

Thompson again points to Fresh Products' retention of Alex Aliemenious, who is white and had lower productivity and higher absenteeism than Thompson, as circumstantial evidence of racial discrimination. However, of the ten employees with lower productivity or higher

---

[9]Of the 268 employees listed on the employee roster for the time of Thompson's employment, 82 identified as white.

absenteeism than Thompson who were considered for layoff but retained, only Aliemenious and one other employee, Michael Field, are white. Six are black, and one is biracial. In light of this context, Fresh Products' retention of Aliemenious does not tend to indicate that Thompson was laid off because of her race.

Finally, Thompson argues that Fresh Products' retention of Brown, who is white, is evidence of racial discrimination. But, as stated above, however, evidence that one competent employee was retained over another is not "sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [her race]" in the RIF context. *Barnes*, 896 F.2d at 1466.

Accordingly, we affirm the grant of summary judgment to Fresh Products on Thompson's race discrimination claims.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment on all of the Thompson's federal and state law claims.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I join in all but Section III(C)(1) of the majority opinion, addressing Thompson's ADA discrimination claim.

The majority acknowledges that Thompson made a sufficient showing that she is disabled under the ADA, that Fresh Products had reason to know of her disability, that she was qualified for her position, and that she was subject to an adverse employment action. The majority nevertheless affirms the dismissal of Thompson's ADA discrimination claim on the basis that she failed to present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out . . . for discharge for impermissible reasons." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). I disagree. Thompson presented sufficient evidence to establish a factual dispute as to whether she was singled out for termination based on her disability.

According to Fresh Products' records, it retained six employees considered for layoff who had lower productivity than Thompson. One of those employees, Alex Aliemenious, had lower productivity and higher absenteeism than Thompson and was not laid off. Shaferly stated that Aliemenious does not have a disability, and she is not aware of any of the other five individuals having a disability. By showing that she was more qualified than these retained, non-disabled employees, Thompson has established a factual dispute regarding whether she was singled out because of her disability. *Id.* at 1466 (explaining that an employee may present additional evidence of discrimination by showing that her qualifications are superior to those outside the protected class who were not subject to the adverse action).

Because Thompson established a prima facie case of disability discrimination, the burden shifts to Fresh Products to provide a legitimate, non-discriminatory reason for the adverse action. *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir. 1994). Fresh Products has met its burden. Shaferly testified that Thompson was selected for layoff as part of a RIF "because

she didn't choose a shift on either of the surveys," R. 52, PID 649, and that when Shaferly walked around the floor and asked Thompson which of the new shifts she would prefer, Thompson said "part-time" "[l]ike 12:00 to 6:00 [AM] or 12:00 to 6:30 [AM]." R. 37 at 374. In the "notes" column of the list of employees considered for layoff, it says "Wants PT" next to Thompson's name. R. 47-6, PID 625. Shaferly's asserted belief that Thompson could not or preferred not to work full time on one of the new shifts provides a legitimate, non-discriminatory reason for laying her off as part of the RIF.

The burden thus shifts back to Thompson to establish a fact dispute regarding pretext. Thompson must show that the reason offered by Fresh Products had no basis in fact, did not actually motivate its conduct, or was insufficient to warrant its conduct. *See Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003). Thompson argues that Fresh Products' proffered reason did not motivate or was insufficient to warrant her termination because (1) Fresh Products did not terminate another employee, Kristen Brown, who also requested part-time work; and (2) several other employees indicated on the survey that they also could not work the new shifts but were not laid off.

Shaferly testified that Brown asked to work part time because she wanted to go to school but that Brown ended up working for Fresh Products beyond the shift change and terminations. In response to Thompson's argument that several other employees who stated they could not work the new shifts were not laid off, the majority points to Shaferly's testimony that Thompson was the only employee who stated she could not work either shift, never selected a preference for one of the shifts, and did not voluntarily quit. However, according to Fresh Products' own documents, it appears that there were four employees who stated on the survey that they would be unable to work the new schedule and did not state a shift preference. Shaferly testified that two of those individuals, Tavares Gill and India Overton, were not laid off and did not quit. She was not asked about the others.

Thompson has thus shown that the circumstances surrounding the retention of these employees are, at the very least, unclear, and undermine Fresh Products' asserted explanation. We have stated that "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference" of discrimination, noting that "an employer's true

motivations are particularly difficult to ascertain" and give rise to difficult issues suited for resolution at trial. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004). Ultimately the trier of fact is charged with determining whether to believe the employer's articulated reason for the adverse employment action. *See Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004).

Viewing the evidence in the light most favorable to Thompson, as required at the summary judgment stage, it cannot fairly be said that no reasonable trier of fact would conclude that Fresh Products' stated reason for firing Thompson was pretext, given the evidence that similarly situated non-disabled employees who responded negatively to the survey or asked to work part-time were retained. Thus, Thompson should have been permitted to proceed to trial to allow the trier of fact to consider and determine whether it was Thompson's survey responses that motivated Fresh Products' conduct, or, rather, her disability.

Accordingly, I would reverse the district court's grant of summary judgment to Fresh Products on Thompson's ADA discrimination claim and otherwise affirm.