NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0296n.06

Case No. 20-4282

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 22, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARION D. JOLLY, RANDY JOLLY, Individually and as Co-Administrators of the Estate of Jason Everett Jolly, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| DYNEGY MIAMI FORT, LLC; DYNEGY, INC., | ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE: GIBBONS, COOK, and DONALD, Circuit Judges.

COOK, Circuit Judge. Jason Jolly died from injuries he sustained while working as an independent contractor at a power station owned and operated by Dynegy, Inc. and Dynegy Miami Fort, LLC. His estate sued, claiming that Dynegy's negligence caused the accident. The district court granted Dynegy's motion for summary judgment, concluding that the company owed no duty of care to Jolly under Ohio law because it did not "actively participate" in the events that led to his death. We AFFIRM.

**I.**

Dynegy ran Miami Fort Station, a power station in Hamilton County, Ohio. It contracted with Jolly's employer—Headwaters CM Services, LLC—to maintain a landfill on the property.

Under the parties' contract, Headwaters acted as an "independent contractor" and maintained "complete and authoritative control as to the details of performing" its work.

Jolly served as a foreman and on-site supervisor in charge of other Headwaters employees. Joshua Waldroff, Dynegy's "by-products coordinator," acted as his company's liaison to the Headwaters crew. Though Waldroff retained ultimate authority over the crew's work and checked in with them throughout the day, he did not dictate how to accomplish the tasks he assigned them.

In the landfill, fly-ash—sediment produced by burning coal—clogged a plastic pipe known as a chimney drain. To unclog it, Jolly and his Headwaters crew used an excavator (a piece of heavy equipment) to remove the sediment. Before they could complete the task, however, the excavator lost traction and became stuck.

To free the excavator, a member of Jolly's crew proposed using a second excavator or a track hoe (another piece of heavy equipment); Jolly agreed. At Jolly's request then, Waldroff rented a track hoe. But that too got mired in the landfill.

With two machines now immobilized, Jolly consulted with Waldroff as to whether Dynegy had any straps or slings Headwaters could use to free them. Waldroff then took Jolly and another crewmember to Dynegy's tool room. Jolly found some synthetic straps, asking Waldroff, "what about these?" Waldroff raised no objection, and Jolly told his subordinate to "grab them straps." To connect the straps, the group took some clevises (steel, U-shaped fasteners) from the tool room.

Back at the landfill, the Headwaters crew planned to free the stuck machines by anchoring them to a bulldozer. They first used a synthetic strap to connect the bulldozer to the track hoe. With Jolly at the helm of the bulldozer and another Headwaters employee operating the track hoe, the crew successfully freed the track hoe. That left the excavator.

Waldroff asked Jolly if the crew should wait for more equipment or personnel to rescue the excavator. But Jolly opted to push ahead. Using the supplies from the tool room, the crew formed a "MacGyver-esque, end-to-end synthetic-strap chain" connecting the excavator to the bulldozer and track hoe. (R. 73, Dist. Ct. Op., at 4790.) When Waldroff noticed Headwaters employees struggling to connect one of the straps, he suggested using a knot called a "basket connection" and explained how to tie it. "In essence, the men tied the strap to the back of the bulldozer, rather than using the clevis to make the connection." (Dist. Ct. Op. at 4791.)

After connecting the three machines, Jolly again took control of the bulldozer; two others operated the excavator and track hoe. But one of the straps in the chain soon broke, causing a "sudden release in tension" that "sling shott[ed]" one of the clevises toward the bulldozer. It broke through the bulldozer's rear window, striking Jolly in the back. Paramedics pronounced him dead at the scene.

Jolly's father and brother then sued, asserting negligence and warranty claims on behalf of his estate and individual claims for pain and suffering, loss of consortium, and punitive damages.[1] The district court granted Dynegy's motion for summary judgment and denied the Jollys' cross-motion for partial summary judgment. As to the negligence claim, the court concluded that Dynegy did not "actively participate" in the events that led to Jolly's death. The Jollys appeal.[2]

---

[1] In addition to Dynegy, the Jollys brought claims against Headwaters and its affiliated companies. They voluntarily dismissed those claims before Dynegy moved for summary judgment.

[2] The district court also entered judgment for Dynegy on the warranty claims and the claims for pain and suffering, loss of consortium, and punitive damages. The Jollys raise no challenge to those decisions on appeal, leaving only their negligence claim on behalf of the estate.

**II.**

We review the grant of summary judgment de novo. *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 518 (6th Cir. 2021). A court appropriately grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view[] the factual evidence and draw[] all reasonable inferences in favor of the non-moving party." *Thompson*, 985 F.3d at 518 (quoting *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 502 (6th Cir. 2013)).

"In applying [Ohio] law, we anticipate how the [Ohio Supreme Court] would rule in the case and are bound by controlling decisions of that court." *Bear Stearns Gov't Sec., Inc. v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 419 F.3d 543, 549 (6th Cir. 2005). The decisions of the Ohio Courts of Appeals "are also viewed as persuasive unless it is shown that the [Ohio Supreme Court] would decide the issue differently." *Id.*

**III.**

Under Ohio law, property owners generally owe no duty of care to independent contractors performing inherently dangerous work. *Wellman v. E. Ohio Gas Co.*, 113 N.E.2d 629, 632 (Ohio 1953); *see also Eicher v. U.S. Steel Corp.*, 512 N.E.2d 1165, 1168 (Ohio 1987) (explaining that independent contractors bear "primary responsibility" for protecting their workers). But a property owner may face liability when it "actively participate[s]" in the independent contractor's work. *Bond v. Howard Corp.*, 650 N.E.2d 416, 420 (Ohio 1995).

Active participation means more than "merely exercising a general supervisory role over the project." *Id.* at 421. As a result, Ohio courts hold that "the provision of materials is insufficient to establish active participation." *Baker v. Coast to Coast Manpower, LLC*, No. 5-11-36, 2012 WL 2371470, at *7 (Ohio Ct. App. June 25, 2012) (collecting cases); *see also, e.g.*, *Patterson v.*

*Adleta, Inc.*, 119 N.E.3d 982, 986 (Ohio Ct. App. 2018). Similarly, Ohio courts recognize that merely assisting an independent contractor does not suffice. *See, e.g.*, *Strayer v. Cox*, 38 N.E.3d 1162, 1174 (Ohio Ct. App. 2015) (no active participation when defendant "help[ed] with the tree removal" but did not "direct[] [the plaintiff] to do anything on the day of the accident"); *Maddox v. Ford Motor Co.*, 86 F.3d 1156 (table), 1996 WL 272385, at *3 (6th Cir. May 21, 1996) (same, when defendant's employee "h[eld] a flashlight and hand[ed] materials" to the plaintiff).

On appeal, the estate seeks to show active participation in two ways; both concern a property owner "direct[ing] or exercis[ing] control over the work activities of the independent contractor[]." *Sopkovich v. Ohio Edison Co.*, 693 N.E.2d 233, 243 (Ohio 1998). The estate maintains that Dynegy "directed the activity which resulted in [Jolly's] injury," and that it "gave or denied permission for the critical acts that led to [Jolly's] injury." *Bond*, 650 N.E.2d at 421.

**A.**

The district court rejected the estate's argument that Dynegy "directed" the machine rescue effort, *id.*, noting that simply providing materials to Jolly's crew cannot support "directing." The district court also rejected the Jollys' claim that Waldroff possessed authority to stop the dangerous activity by finding it represented "exactly the kind of latent control that Ohio courts say is not enough." Additionally, the district court assessed Waldroff's assistance in connecting the machines to fall short of what Ohio law requires to hold Dynegy liable for Jolly's death. Waldroff's suggestion for Jolly's crew to employ the "basket connection," the court held, "did not carry the compulsive or directive quality that gives rise to active participation."

**B.**

On appeal, the estate acknowledges the general principle that active participation demands more than either providing materials or assisting with an independent contractor's activities. The

estate nevertheless contends that the combination of the two suffices. It fails, however, to identify one case so holding. And courts decline to find active participation even where those circumstances exist in tandem. *See, e.g., Strayer*, 38 N.E.3d at 1166, 1174–75 (owner did not direct activity when he supplied a wrench and helped contractor with tree removal); *Hillabrand v. Drypers*, No. 9-02-37, 2002 WL 31260045, at *3–4 (Ohio Ct. App. Oct. 10, 2002) (same, when owner furnished dumpster and its employees helped move it); *Maddox*, 1996 WL 272385, at *1, *3 (same, when owner "h[eld] a light [for contractor] and suppl[ied] him with solder").

Citing the basket connection, the estate also claims that Waldroff's "act of showing [Jolly] *how* to connect the straps elevated his intervention from aiding and assisting to instructing and directing." We agree with the district court, however, that Waldroff's actions—including the basket-connection idea—"did not carry the compulsive or directive quality that gives rise to active participation." (Dist. Ct. Op. at 4802–03.) Waldroff "was involved in the discussions regarding" the attempt to rescue the machines but did not "issue[] instructions regarding how [the Headwaters crew] must perform the job." *Evans v. Dayton Power & Light Co.*, No. 03CA763, 2004 WL 928297, at *8 (Ohio Ct. App. Apr. 28, 2004). He did not "instruct [Jolly] to use the provided equipment or determine[] the manner in which" the crew attempted to free the machines. *Baker*, 2012 WL 2371470, at *7. To the contrary, Waldroff suggested waiting for more personnel and materials. As the district court recognized, Jolly—not Waldroff—"acted within his own discretion" to push forward with the rescue operation. *Marshall v. Kokosing Constr. Co.*, No. 99CA1, 1999 WL 1030742, at *4 (Ohio Ct. App. Nov. 4, 1999).

To be sure, as the estate notes, Ohio courts distinguish between a property owner telling a contractor "'how' to perform certain work rather than just 'where' and 'when' to perform the work." *Keffer v. Honda of Am. Mfg. Co.*, No. 14-89-28, 1990 WL 197856, at *3 (Ohio Ct. App.

Dec. 7, 1990); *see also, e.g.*, *Bell v. DPL, Inc.*, No. 98CA663, 1999 WL 713589, at *4 (Ohio Ct. App. Aug. 31, 1999). And here, Waldroff's suggestion to employ the basket connection concerned "how" the crew could free the machines rather than simply "where" or "when" it should do so. But Ohio law still requires "something akin to directing, instructing, or requiring that actions be performed . . . in a certain way." (Dist. Ct. Op. at 4802 (citing *Patterson*, 1189 N.E.3d at 986).) Waldroff did not "require[]" the crew to use the basket connection, *Strayer*, 38 N.E.3d at 1174, "control" how the crew used the straps, *Patterson*, 119 N.E.3d at 986, or "dictate[] the mode and manner" of the rescue operation, *Hamilton v. RB&W Corp.*, Nos. 71795, 71796, 71802, 1998 WL 32777, at *4 (Ohio Ct. App. Jan. 29, 1998). He simply "suggested" using the basket connection "[a]fter [he] noticed [the crew] struggling." (R. 59 at 3709.) That suggestion cannot show that he "directed" the Headwaters crew's activities. *Bond*, 650 N.E.2d at 421.

### C.

As to the question of whether Dynegy "gave or denied permission for the critical acts that led to [Jolly's] injury," *Bond*, 650 N.E.2d at 421, the district court also found that argument unmeritorious. It identified the critical act as "freeing the machinery by using a series of synthetic straps." Though the district court found Waldroff to have acquiesced in Jolly's borrowing the straps he wanted, it concluded that he never granted or denied permission to employ them to free the stranded machines. Instead, according to the court, Waldroff simply "deferred to Jolly's decision-making and expertise with regard to freeing the equipment," which "does not amount to active participation." (Dist. Ct. Op. at 4804 (citing *Strayer*, 38 N.E.3d at 1174).)

**D.**

The estate criticizes the district court's analysis as "defin[ing] 'permission' too narrowly," essentially requiring an express grant to satisfy the Ohio standard. It argues that Waldroff's actions constitute implied permission that ought to suffice.

As support for its implied-permission argument, however, the estate points to three Ohio cases not addressing active participation. And in the active-participation context, Ohio courts reject implied permission as insufficient. *See Lamb v. Summit Mall*, No. 20011, 2001 WL 39597, at *3 (Ohio Ct. App. Jan. 17, 2001) ("Although [the plaintiffs] assert that [the defendant] gave implicit permission to use the ladder, there is no evidence that they mandated its use and thus exercised control over this aspect of the work . . . ."); *Naragon v. Dayton Power & Light Co.*, No. 17-97-21, 1998 WL 142386, at *6 (Ohio Ct. App. Mar. 30, 1998) (no active participation when "the record [did not] disclose any request" for permission that defendant denied); *Pifher v. Ford Motor Co.*, No. 93CA005581, 1994 WL 431544, at *7 (Ohio Ct. App. Aug. 10, 1994) (same, without evidence that independent contractor's employees "attempted to remedy the situation by seeking, and being refused, permission to cover the openings").

At a minimum, the dearth of precedent supporting the estate's position cautions us against "adopting 'substantive innovation' in state law." *Blessing v. Chandrasekhar*, 988 F.3d 889, 903 (6th Cir. 2021) (quoting *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015). That caution makes good sense: as the district court recognized, "[p]roperty owners always have the latent authority to prevent guests on their property from performing tasks—the owners can instruct the person to leave." If courts inferred permission from the property owner's failure to object, "the exception would swallow the rule."

The estate also complains that the district court "conflat[ed] 'permission' with 'control.'" *See* Dist. Ct. Op. at 4804 (explaining that the "control" evidenced by Waldroff allowing Jolly to remove straps from tool room "falls well short of exercising control over the critical act of freeing the machinery by using a series of synthetic straps"). In the estate's view, "'control' is associated with the 'direct' prong of the 'active participation' test" and the permission prong "has nothing to do with control." But as Dynegy notes, "'control' is central to the active participation analysis," regardless of the prong involved. Whether a property owner directs the activity (the first prong) or grants or denies permission for the critical act (the second prong), "active participation arises due to the hiring entity's control over work activities." *Clark v. Ohio Dep't of Transp.*, No. 19AP-495, 2020 WL 6887974, at *4 (Ohio Ct. App. Nov. 24, 2020).

In the end, the estate relies on the same evidence to satisfy the second prong as it did the first: Waldroff supplying Jolly with materials from the tool room and showing the Headwaters crew how to make the basket connection. But given Ohio courts' unwillingness to impose a duty based on implied permission, those arguments fare no better under the "permission" prong. In *Evans*, for example, the defendant "apparently knew that the pipefitters were using come-alongs [i.e., handheld tools] to temporarily secure [large, heavy] coils." 2004 WL 928297, at *8. The independent contractor even borrowed some of the come-alongs from the defendant. *Id.* But those facts—knowledge plus provision of materials—"d[id] not amount to [the defendant's] authorization to secure the coils in this manner." *Id.*; *see also, e.g.*, *Patterson*, 119 N.E.3d at 986 (rejecting argument that property owner gave permission for critical act by "provid[ing] the ladder for [plaintiff's] use"). So too here. As the district court acknowledged, "Waldroff granted the Headwaters employees access to the Miami Fort Station tool room and let Jolly select the straps

and clevises for freeing the equipment." But Jolly never sought—and Waldroff never granted or denied—"permission to use those tools to free the track hoe or the [excavator]."

The estate's reliance on the basket connection suffers from an additional flaw. The "permission" prong demands an inquiry into the "critical act" that caused the plaintiff's injuries. *Bond*, 650 N.E.2d at 421. As the estate apparently now recognizes and its expert conceded below, "the basket connection did not fail." (Appellee Br. at 18 (citing R. 63 at 4404–07); *see* Reply Br. at 9–10.) Instead, *using synthetic straps* to free the machines constituted the critical act. That decision rested with Jolly, who selected the straps and elected to push forward—contrary to company policy—with the personnel and materials at his disposal.

The estate criticizes this analysis, insisting that because it relates to breach and causation, it "is irrelevant to whether Dynegy owed a duty in the first instance." But the active-participation standard specifically calls for identification of the "critical act." That inquiry may well overlap with issues of breach and causation. *See, e.g.*, *Critical*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/critical ("crucial" or "decisive"). But it nonetheless bears on the existence of a duty under Ohio law. *See Bond*, 650 N.E.2d at 421. And here, Waldroff "simply suggested" that the crew use a basket connection and that suggestion "was not the critical act." *Cross v. Hydracrete Pumping Co.*, 728 N.E.2d 1104, 1110 (Ohio Ct. App. 1999). Instead, "the 'critical act' that led to [Jolly's] death was his choice" to attempt to free the machines with synthetic straps. *Marshall*, 1999 WL 1030742, at *4.

**IV.**

We AFFIRM.